# UNITED STATES *v.* UNITED STATES STEEL CORPORATION ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 6. Argued March 9, 12–14, 1917; restored to docket for reargument May 21, 1917; reargued October 7–10, 1919.—Decided March 1, 1920.

That an industrial combination is formed with the expectation of achieving a monopoly is not enough to make it a monopoly within the meaning of the Anti-Trust Act. P. 444.

*Held,* that the power attained by the United States Steel Corporation, much greater than that of any one competitor, but not greater than that possessed by them all, did not constitute it a monopoly. *Id.*

The fact that a corporation, alleged to be an illegal combination, during a long period after its formation persuaded and joined with its com-

petitors in efforts, at times successful and at times not, to fix and
maintain prices in violation of the Anti-Trust Act, does not warrant
present relief against it, if the illegal practices were transient in pur-
pose and effect, were abandoned before the suit was begun because of
their futility and not for fear of prosecution, and have not since been
resumed; and if no intention to resume them or dangerous probability
of their resumption is shown by the evidence. Pp. 444 *et seq.*

Purpose and effect of the Steel Corporation's acquisition of control of
the Tennessee Coal & Iron Company, considered, in the light of
President Roosevelt's prior approval of the transaction and his
testimony concerning it. P. 446.

Upon the question whether the power possessed by the Steel Corpora-
tion operated *per se* as an illegal restraint, *held* that testimony of its
officers, its competitors, and hundreds of its customers, to the effect
that competition was not restrained and that prices varied or re-
mained constant according to natural conditions, must be accepted
as clearly outweighing a generalization advanced by government
experts that constancy of prices during certain periods evinced an
artificial interference. P. 447.

An industrial combination, short of a monopoly, is not objectionable
under the act merely because of its size—its capital and power of
production—or merely because of a power to restrain competition,
if not exerted. Pp. 447, 450 *et seq.*

The act prohibits overt acts, and trusts to their repression and punish-
ment. P. 451.

The fact that competitors of a combination voluntarily follow its
prices does not establish an unlawful restraint; the act does not com-
pel competition. Pp. 449–451.

In commanding the courts to "prevent and restrain violations" of it,
the Anti-Trust Law has regard to conditions as they may exist when
relief is invoked and to the usual powers of a court of equity to adapt
its remedies to those conditions. P. 452.

The act does not expect the courts to enforce abstractions to the sub-
version of its own purposes, but leaves to them to determine, in each
instance, the relief appropriate for the execution of its policy. *Id.*

Therefore, admitting that the Steel Corporation was in origin a com-
bination of competing companies actuated by an unlawful purpose,
yet it being proved and found in this case that that purpose, and
illegal practices which followed the combination, were abandoned as
futile months before this suit was begun, and that the combination,
viewed as of today, is not in itself or by its conduct offensive to the
statute, the policy of the statute, which respects the public interest

as paramount, would be defeated rather than subserved were the court, for retrospective reasons merely, to destroy the combination, or separate some of its subsidiaries as suggested, and thereby destroy or impair the investments invited of the public, and the foreign trade and other large developments made during the ten years that intervened before the Government began any legal attack. Pp. 452 *et seq. Standard Oil Co.* v. *United States,* 221 U. S. 1; and *United States* v. *American Tobacco Co.,* 221 U. S. 106, distinguished.

No feasible way of dissolving the combination and yet protecting its foreign trade, under the Webb Act, c. 50, § 2, 40 Stat. 516, or otherwise, has been suggested. P. 453.

223 Fed. Rep. 55, affirmed.

THE case is stated in the opinion.

*Mr. Assistant to the Attorney General Ames* and *Mr. Henry E. Colton,* Special Assistant to the Attorney General, for the United States:[1]

In comprehensive terms the substance of the charge is: (1) That between 1898 and 1900 combinations were formed in various branches of the iron and steel trade, not as an incident of normal growth, but with the purpose and effect of unduly restricting competition, and that they still exist, contrary to the Anti-Trust Act of July 2, 1890. (2) That in 1901, by means of a holding company, these several illegal combinations, each dominant in its respective field, and other powerful units, were all brought together in one super-combination of overwhelming power, which, augmented by further acquisitions, still exists, unduly restricting competition in the iron and steel trade as a whole and in practically every important branch thereof, contrary to the same act of Congress.

---

[1] At the former hearing the case was argued by *Mr. Solicitor General Davis, Mr. Assistant to the Attorney General Todd* and *Mr. Henry E. Colton,* Special Assistant to the Attorney General. *Mr. Attorney General Gregory* and *Mr. Robert Szold* also were on the brief, from which the argument is abstracted.

The several combinations formed during the period 1898–1900 greatly increased prices in almost every instance, especially the combinations affecting the lighter finished products, such as tubes, wire nails, tin plates, etc. Prices of pig iron, semi-finished products and rails also were increased. But notwithstanding the concentration of control in particular lines resulting from these combinations, competition was still able to make itself felt, taking the industry as a whole, and as the year 1900 drew to a close was threatening to become very active, and, with the revival of active competition, prices, which had been enormously increased, underwent substantial declines. Then was formed the present corporation—a holding company, which controls the important acts and policies of the constituent combinations, and, among other things, generally determines the prices which they may charge for their finished products. As the proposal for the super-combination began to take form, prices, which had receded with the revival of competition in the latter half of 1900, began to rise again. The upward movement became marked as the organization of the combination was perfected. While some have since fallen, these prices have nevertheless been maintained by the combination at a substantially higher level than prevailed during competitive periods prior to its formation.

Except for the internal alterations and further acquisitions, which increased the control, the several combinations above described and the super-combination in which they were all united have continued down to the present time without change of substance. Their proportion of the trade, whilst not quite so great as at first, is still overwhelmingly preponderant.

Congress was moved to pass the Anti-Trust Act by two main considerations: (1) The desire to preserve the competitve system of industry. (2) The conviction that

that system was threatened by the undue concentration of commercial power resulting chiefly from the unrestricted exercise of the right of combination.

Every combination which by its necessary effect or because of the character of the means employed threatens the normal operation of the law of competition, in other words, unduly restricts competition, is therefore within the purview of the act.

It was not intended, however, to set a limit to the enlargement of a business by normal growth, the competitive system being in no danger from that quarter.

The purpose of the parties is important in determining the question of normal growth, but, that out of the way, it is of no further consequence where the necessary effect of the combination is unduly to restrict competition.

Except as throwing light on the purpose of the parties, it is immaterial how the combination is created, whether through simple agreement, through the old form of trust, through a holding company, or through the actual purchase and consolidation of plants.

Competition may be unduly restricted through voluntary combinations of competitive traders and trade units no less than by combinations to exclude one or more such from their right to trade.

Whether restriction of competition through voluntary combinations is undue depends primarily upon the extent of the restriction. Without attempting to draw the exact line, the restriction is certainly undue where the combination embraces units which together occupy a preponderant position in a given industry.

What constitutes a preponderant position must be determined in the light of conditions in the particular branch of trade affected. The principal factors to be considered are (1) the portion of the trade engrossed by the combination as compared with the portion possessed by each of its competitors as well as with the whole, and

(2) the extent of the control, if any, acquired by the combination over raw materials or over the agencies of transportation and of distribution or over the reserve supply where the article of trade is one the supply of which is limited by nature.

At the time they were combined under the control of the United States Steel Corporation the American Steel & Wire Company, the American Tin Plate Company, the American Sheet Steel Company, the American Steel Hoop Company, the National Tube Company and the American Bridge Company were severally combinations in restraint of trade, each being a combination of formerly competitive units together occupying an overwhelmingly preponderant position in a distinct branch of the iron and steel trade and each having been organized for the purpose of suppressing competition and increasing prices.

It has never been doubted that combinations of this type, embracing a dominant proportion of those engaged in a particular industry and formed for the express purpose of suppressing competition between them, are combinations in restraint of trade. *Addyston Pipe Co. v. United States*, 175 U. S. 211; *Swift & Co. v. United States*, 196 U. S. 375, 394; *Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U. S. 273, 408. Nor is it material, their purpose and effect being what they were, that the combinations here assailed were created in corporate form instead of by loose agreement. *United States v. American Tobacco Co.*, 221 U. S. 106, 176, 181. Indeed, where, as here, corporations simply exchange their plants and businesses for stock in a consolidated corporation, the resulting combination is in no respect different in principle from a combination in the form of trust which the statute specifically prohibits. *Northern Securities Co. v. United States*, 193 U. S. 197, 326, 327; *United States v. Reading Co.*, 226 U. S. 324, 352–363; s. c. 183 Fed. Rep. 427, 470; *Patterson v. United States*, 222 Fed. Rep. 599, 619, 620; Noyes, Intercorporate Rela-

tions, § 354; Eddy, Combinations, § 622.   Wherefore we submit that the illegality of these combinations is not merely debatable, as the defendants themselves admit as to some, but is conclusive as to all.   They were still occupying the illegal position thus acquired in various branches of the steel trade when united under the control of the United States Steel Corporation in 1901.

The Steel Corporation is a combination in restraint of trade, because it is not the result of natural trade growth but is a mere instrumentality for combining competing corporations which together occupy an overwhelmingly preponderant position in trade and commerce in iron and steel products generally.   The group of independent plants and businesses combined under one control through the corporation included the largest and most powerful competitors in practically every branch of the iron and steel industry in rails; plates; structural shapes; wire rods and wire products; hoops, bands, and cotton ties; skelp; wrought pipe and tubular goods; seamless tubes; bars; billets and sheet bars.   And not only were the competitors united under the control of the Corporation the largest and most powerful units in practically every branch of the iron and steel industry, but generally speaking they were splendidly grounded as regards the production of the basic products—ore, pig iron, ingots.   This is sustained by the findings of Woolley and Hunt, JJ., in the court below and by the investigation made by the Bureau of Corporations.

The preponderant position and the dominance of this combination is manifested by its capital as compared with that of competitors; its proportion of the total production; its proportion of the total production as compared with that of each of its principal competitors; its proportion of ore reserves; its control over transportation of ore; its effect upon prices; concerted maintenance of prices under its leadership; and opinion evidence as to its power.

Whilst in our view of the law a combination of able competitors occupying an overwhelmingly preponderant position in a given trade, such as the combination embodied in the Corporation, unduly restricts competition by its necessary effect, and therefore is unlawful regardless of purpose, nevertheless it is appropriate to show a wrongful purpose as a matter of aggravation. It is elementary, of course, that the purposes of illegal combinations are seldom capable of proof by direct testimony, but must be inferred from circumstances. *Eastern States Retail Lumber Dealers' Assn.* v. *United States*, 234 U. S. 600, 612; *Reilley* v. *United States*, 106 Fed. Rep. 896; *United States* v. *Sacia*, 2 Fed. Rep. 754, 757; *Regina* v. *Murphy*, 8 C. & P. 397, 404. The considerations going to show that the controlling purpose of this super-combination was not the legitimate development of trade, but suppression of competition and exploitation of the public, are: the form of the combination—a holding company not itself engaged in trade at all; the union of so many competitors controlling so large a proportion of the trade; the general competitive situation, falling prices, etc., immediately before the formation of the combination; increase in prices immediately following formation of the combination; gross overcapitalization of the combination in anticipation of excessive profits; enormous promoters' profits; cancellation by the combination of contracts for extensions, etc., previously entered into by constituent companies; and subsequent acquisitions. (See the findings of Woolley and Hunt, JJ., and of the Bureau of Corporations.)

We are dealing here with a combination of competitors in the truest sense and not with the mere purchase by one competitor of the business of another as an incident of normal development. The distinction between a mere purchase of a competing business and a combination of competing businesses clothed in the form of purchases is sharply drawn in *Shawnee Compress Co.* v. *Anderson*, 209

U. S. 423.  See Noyes, Intercorporate Relations, § 354.
If the vast aggregation of competing businesses here in-
volved occupying an overwhelmingly preponderant posi-
tion in practically every branch of the iron and steel in-
dustry had been combined by executory agreement or in
the old form of trust there would be none to dispute the
illegality of the transaction.  The legal situation is not
changed by substituting a holding company as the in-
strument of combination.  The vesting in such a company
of the capital stocks of a group of able competitors for the
purpose of centralizing control is no more lawful, is no
more a normal method of business development, than the
similar centralization of control in common trustees under
the old form of trust.  In such case, indeed, the holding
company is but the old trust in corporate form.  *Northern
Securities Co.* v. *United States, supra; Standard Oil Co.* v.
*United States,* 221 U. S. 1; *Temple Iron Co.* v. *United
States,* 226 U. S. 324; *s. c.* 183 Fed. Rep. 427.  It is
literally a case, therefore, of the stockholders of a group of
competing corporations transferring the control of each
into the hands of a committee of trustees—a form of
combination in restraint of trade which has ever been re-
garded as peculiarly obnoxious.  If competitors control-
ling half the trade not alone in one product or in two but
in an entire series of products constituting one of the
grand divisions of industry may thus combine through a
holding company, to what lengths can the process go
without offending the law?  If one-half of the steel indus-
try may be thus combined through one holding company,
certainly those controlling the other half would have the
right to combine through another holding company.  And
of course if it be lawful to centralize control of the steel
industry in two holding companies it would be equally
lawful to centralize control of every other industry in two
holding companies.  Such undue concentration of control
over industry was the very evil which the act was in-

tended to prevent. *United States* v. *Reading Co.*, 226 Fed. Rep. 229, 272.

The Corporation is also an instrumentality for uniting and enlarging the power of a group of combinations of competitive units in particular branches of the iron and steel trade, each in and of itself unlawful. There is no likeness between this case and *United States* v. *Winslow*, 227 U. S. 202, 217. This case presents a parallel to the *American Tobacco Case, supra,* where there was a combination in restraint of trade not in cigarettes alone, nor in smoking tobacco alone, nor in chewing tobacco alone, but in the whole tobacco industry.

This is not a case where the purpose was "integration." Integration consists in combining supplementary, noncompetitive trade units. An illustrative case is *United States* v. *Winslow, supra.* If, therefore, we were successful in showing that the corporations combined in this case through the holding company are either competitors themselves or illegal combinations of competitive businesses, the idea of integration is at once excluded. You can not centralize control of an entire industry by first separately combining competitors in the various branches thereof and then uniting them in one super-combination and hope to escape the prohibitions of the law by calling what was done "integration." Moreover, the units combined in 1901 through the Corporation were already, for the most part, highly integrated. No one, of course, denies the advantage of concentrating under one management the various stages of steel manufacture from the ore mine to the finishing mill. This can be done, however, and can be best done, just as economical size can be attained, without setting up in every branch of trade a combination of competitors with power to exercise substantial dominance over the rest.

The contention that a combination of such size and power was a necessary means to attain efficiency and to

promote foreign trade is irrelevant in law. It is but another way of saying that good intentions can save the combination from illegality. *Thomsen* v. *Cayser*, 243 U. S. 66; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 341; *Addyston Pipe Co.* v. *United States*, 175 U. S. 211, 234, 243; *Swift & Co.* v. *United States*, 196 U. S. 375, 396. The intent to violate the law implied from doing what the law prohibits renders immaterial every other intent, purpose, or motive. Bishop, New Criminal Law, § 343; Holmes, The Common Law, p. 52. Applying this principle, this court from the very beginning has held that a contract or combination by its own "inherent nature or effect," without more may "restrain trade within the purview of the statute." Any other construction would require courts to decide not only whether a given combination prevents the existence of effective competition or constitutes a virtual monopoly, but whether in their opinion monopoly would not be, on the whole, a better policy than competition—i. e., would compel them to act on frankly legislative grounds. *Park & Sons Co.* v. *Hartman*, 153 Fed. Rep. 24, 46. Congress rightly believed that the advantages of large business units, in so far as they are real and substantial, would inevitably assert themselves by normal growth. It closed the short cut to those advantages—monopolistic combination—because danger lies that way. "If there is evil in this it is accepted as less than that which may result from the unification of interest, and the power such unification gives." *National Cotton Oil Co.* v. *Texas*, 197 U. S. 115, 129. "Competition is worth more to society than it costs." *Vegelahn* v. *Guntner*, 167 Massachusetts, 92, 106. Furthermore, even if it would have been lawful for the many independent businesses combined through this holding company to unite to some extent to develop foreign trade—by joint selling agencies, for example—that can not justify the complete and permanent suppression of

competition between them in domestic trade. *United States* v. *Corn Products Refining Co.*, 234 Fed. Rep. 964, 1016; *United States* v. *Union Pacific R. R. Co.*, 226 U. S. 61, 93.

The contention that such was the purpose is also unfounded in fact.

As for the contention that competition has increased while the combination's proportion of the trade has decreased, it is true that as regards the proportion of the trade in steel products possessed by the combination there has been some decline from the highwater mark reached shortly after its formation, but there has been no such decline as to curtail the power of the combination.

It is rather the usual thing in such cases for the combination to be able to show some relative decline in its proportion of the trade. It was so held with the Standard Oil Company and with the American Tobacco Company. In fact, it is so uniformly the case as to excite the suspicion that combinations of this character, having found they can dominate the trade with a smaller proportion of it than they started with, voluntarily yield a part in the belief that they thereby put themselves in a better position to face the law. But be this as it may, where, as here, the decline still leaves the combination in an overwhelmingly preponderant position, it is of no legal consequence whatever. In such a case the original vice persists and the combination is a "continually operating force," restraining trade within the meaning of the first section of the act, *Standard Oil Co.* v. *United States, supra; United States* v. *Union Pacific R. R. Co.*, 226 U. S. 61, 96; *United States* v. *Kissel*, 218 U. S. 601; and a "perennial violation of the second section" prohibiting monopoly, *Standard Oil Co.* v. *United States, supra,* 74; *Patterson* v. *United States*, 222 Fed. Rep. 599, 625; *United States* v. *Corn Products Refining Co.*, 234 Fed. Rep. 964, 1018.

The present bill charges a combination to suppress

competition between the parties to the combination themselves. In such a case the only question is whether the combination embraces competitors in sufficient number and of sufficient importance to make the resulting restriction of competition a substantial or undue restriction. Whether such a combination is also attempting to hinder the competition of those outside the combination is of no weight except as a matter of aggravation.

The contention that the combination is not unlawful because its power though great is yet not great enough to enable it alone to fix and maintain prices would require a combination of competitors to amount to a monopoly to fall within the prohibition. This theory was rejected by this court in the first case under the Anti-Trust Act which came before it. *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 16. To the same effect is the language of Mr. Justice Day, then a circuit judge, in *Chesapeake & Ohio Fuel Co.* v. *United States*, 115 Fed. Rep. 610, 624.

Furthermore, neither the circumstance that the Corporation combined with competitors to maintain the higher prices established by the combinations whose stocks it acquired, nor that in ten years while increasing its trade enormously its relative proportion suffered a small decline, justifies the inference that the Corporation could not have maintained the higher prices by the exertion of its own power alone. It would be a strange result if the combination of competitors embodied in the Corporation should escape condemnation because of their illegal conduct in agreeing upon prices with outside manufacturers.

The contention that the case must fail because the combinations have not increased prices, or limited production, or degraded the quality of product, or decreased wages, or decreased the price of raw materials, or oppressed competitors, loses sight of the broader policy of the act, which was, not to wait until the evils enumerated are

already upon us, but to prevent their occurrence by striking at their underlying cause—undue concentration of commercial power through the process of combination. The test of the legality of a combination, therefore, is not its present effect upon prices, wages, etc., nor its present conduct toward the remaining competitors, but its effect upon competition. If its effect is unduly to restrict competition, then it is immaterial that for the time being the combination may exercise its power benevolently. This defense of good conduct has been interposed in many cases of this character, and as many times rejected. Nor is forbearance by a combination from the exercise of its power to drive the remaining competitors from the field, or to prevent new ones from entering, on any different footing from good conduct of any other sort. The cases make no such distinction. Obviously, where a combination takes in so large a proportion of the competitors or competitive units that effective competition no longer exists, it can be no defense to say that the combination is doing nothing to prevent the restoration of competitive conditions.

This contention is based on a construction of the law impracticable in execution.

*Mr. Richard V. Lindabury, Mr. David A. Reed* and *Mr. Cordenio A. Severance*, with whom *Mr. Raynal C. Bolling* was on the brief, for United States Steel Corporation *et al.*, appellees, cited and discussed the following, as revealing what the Anti-Trust Act means by "restraint of trade": Senator Hoar, Autobiography of Seventy Years, vol. II, p. 364; *United States* v. *Du Pont De Nemours & Co.*, 188 Fed. Rep. 127, 150; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290; *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. 396, 408; *Northern Securities Co.* v. *United States*, 193 U. S. 197, 337, 361; *Standard Oil Co.* v. *United States*, 221 U. S. 1, 58, 60, 61; *United States*

v. *American Tobacco Co.*, 221 U. S. 106, 179; *United States* v. *Terminal Railroad Assn.*, 224 U. S. 383, 394; *Nash* v. *United States*, 229 U. S. 373, 376.

Whether, or to what extent, the *Standard Oil* and *Tobacco Cases* modify the rule laid down by Mr. Justice Peckham in the *Freight Association Case* as applicable to public service corporations is not of account in the present case. That they do make a distinction between restraint of competition and restraint of trade in the case of private trading and manufacturing companies, and do hold that as to such companies the restraint of competition in order to amount to restraint of trade must be undue or unreasonable, is entirely clear, and is recognized in the subsequent cases. These cases also hold, as pointed out by Judge Lanning in the *Du Pont Case*, that whether the restraint of competition in the case of such companies amounts to restraint of trade must be determined upon the facts and circumstances of each particular case.

Applying these principles, the direct and necessary effect of the organization of the Steel Corporation was neither to restrain trade nor create a monopoly, viewed either from the standpoint of competition suppressed or from that of the extent of control acquired over production or raw materials. *Swift & Co.* v. *United States*, 196 U. S. 375; *United States* v. *Standard Oil Co.*, 173 Fed. Rep. 177, 183; *United States* v. *American Tobacco Co.*, 164 Fed. Rep. 700, 719; 221 U. S. 157, 182; *United States* v. *Reading Co.*, 226 U. S. 324, 370.

Notwithstanding the foregoing cases, the Government insists that, as a matter of law, the suppression of competition is undue whenever the combination controls units which together occupy a preponderant position in a given industry, and this without regard to the intentions of those who form it or the after conduct of the combination. We submit that no such test is warranted either by the language of the Anti-Trust Act or by the decisions of

this court. Whether restraint is unreasonable, and therefore undue, is declared in *United States* v. *Terminal Railroad Assn., supra,* to depend upon three things: (1) the extent of such control; (2) the method by which such control was brought about; and (3) the manner in which such control has been exercised. This is but a formulation of the rule laid down in the *Tobacco Case.* But we submit that *a priori* reasoning as to the direct or necessary effect of the organization of the Steel Corporation or as to the result produced by its preponderant position in the industry, if it has such a position, is uncalled for in the present case. When the evidence in the case was closed, thirteen years of the active life of the Corporation had passed. If restraint of trade or monopoly necessarily resulted from its formation or from its so-called preponderant position in the industry, evidence of such restraint or monopoly would appear somewhere in its history; and if such evidence does not appear, it is reasonably safe to conclude that no such result inhered in its organization or position. That the organization did not so result at any time or as to any article of steel production, is, we submit, conclusively shown by the testimony in the case, as pointed out in both opinions of the court below. And not only is this shown by the testimony, but it is also shown that the Corporation never acquired the power either to monopolize or to restrain trade. And this too was found by all the judges of the court below.

No intent to monopolize or to restrain trade is shown by the circumstances which led up to and surrounded the organization of the Corporation. The organization was but a natural and normal development from existing trade and manufacturing conditions and was only notable because of the largeness of the conception which underlay it and the courage exhibited in undertaking to carry it out. But ability to think large and courage to execute the thought are not condemned by the law. Indeed, the

future prosperity of our country must depend in large measure upon the encouragement given to these attributes of the American business man.

Nor is an intent to monopolize or restrain trade evinced by the after-conduct of the Corporation. Throughout its whole career the Corporation has pursued the objects declared by its founders at the time of its formation, decreasing the cost of production, increasing wages, decreasing prices, and greatly extending trade in steel products both at home and abroad. Its treatment of both competitors and consumers has been fair and just; it has neither attempted to oppress the one nor to coerce the other. The few plants which it has purchased were offered to it, and with a single exception they were purchased only because they were needed in the development of the Corporation's business. That exception was the plant of the Tennessee Company, and this was purchased with the approval of the Government for the purpose of preventing the spread of a dangerous financial panic. Instead of promoting pools and combinations, the Corporation destroyed them as early as 1904. Although the manufacturers met together from time to time after the breaking up of the pools, they went no further at their meetings than to mutually exchange information and make declarations of purpose which the petition admits they had a lawful right to do. The Gary dinner movement amounted to nothing more than an endeavor to prevent reckless price-cutting and general demoralization at a time of great industrial peril, and this was sought to be accomplished simply by an appeal to reason and the establishment of a relation of mutual respect and confidence, by which it was hoped to secure open and fair dealing and prevent the misunderstandings out of which nearly all the trade wars of the past had grown. Instead of monopolizing the manufacture of steel, the Corporation's percentage of the country's production has steadily

decreased; instead of monopolizing the supply of ore, the Corporation has confined its purchases to two or three localities, and in the locality where its holdings are largest it has relatively less than many of its competitors and less than its own experts and the experts of its competitors testify that it ought to have. We respectfully submit that by this record the Corporation has proved the *bona fides* of the claim made for it at the time of its organization, that its purpose was the development of a great business along legitimate and permissible lines, and not monopoly or restraint of trade. If, however, the circumstances surrounding the organization left the matter of intent in doubt to be established by the after-conduct of the parties, we now have such after-conduct extending over the long period of thirteen years, and we submit that it completely rebuts any presumption (if any there was) of intent to restrain trade or to acquire a monopoly, and as completely establishes the contrary intent.

Whatever, therefore, may have been the purpose or immediate effect of the organization of the Steel Corporation, it goes for nothing unless it be found that at the time the petition was filed the Corporation was offending or threatening to offend against the Anti-Trust Act. This results from the fact that the action is brought under the third section of that act which authorizes the Attorney General to institute proceedings in equity to prevent or restrain violations of the act. The appeal is to the injunctive power of the court which is never exercised to redress alleged wrongs which have been committed already, but only to restrain those which are still existing or are threatened. High on Injunctions, § 23; Pomeroy's Equitable Remedies, vol. I, § 262.

The Corporation had no monopoly and was not restraining trade when the petition was filed, nor was it threatening to acquire a monopoly or to restrain trade. It has not the power to do either.

We insist that the acquisition of a preponderant position in a trade or manufacture (whether this means size or power) without unlawful intent and without excluding practices, does not constitute restraint of trade or monopoly either at common law or under the Federal Anti-Trust Act when no actual monopoly or actual restraint of trade results therefrom. How could it? Size in itself is nothing as we have already shown. And power to do wrong cannot be confounded with wrongdoing itself without leading to hopeless confusion. We are dealing with a criminal statute. If the acquisition of power to violate a statute is the equivalent of its violation, then all men are guilty, for all have acquired the power to violate not one but many statutes. In the opinions in some of the railroad cases (*United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 334; *Northern Securities Co.* v. *United States*, 193 U. S. 197, 373; *United States* v. *Union Pacific R. R. Co.*, 226 U. S. 61, 88) are to be found expressions to the effect that it is the scope of combinations of the kind there under consideration and the power to suppress competition and create monopoly which results therefrom that determines the applicability of the Anti-Trust Act. In those cases, however, the corporations combining were under a duty to compete, and any substantial suppression of competition between them was, therefore, illegal—the scope of the combinations (i. e., what they embraced) alone determining their illegality. No such rule has ever been applied to private trading or manufacturing companies, and this for the obvious reason that such companies are under no duty to compete. *Meredith* v. *N. J. Zinc & Iron Co.*, 55 N. J. Eq. 212, 221. In the *Tobacco Case* the combination was condemned because the court thought the conclusion of wrongful purposes and illegal combination was overwhelmingly established by the circumstances surrounding the organization and the after-conduct of the company, showing an ever present intent to drive compet-

itors out of the field and to monopolize the tobacco trade. Nothing, we submit, could be more unreasonable than to condemn every corporation, without regard to its purposes or practices, which happens to exceed in size or trade power any other competitor in the field. A rule which would lead to that result, instead of protecting commerce—which was the object of the Anti-Trust Act— would tend to throttle and destroy it by driving or keeping out of the competitive field all but the incompetents and inefficients.

*International Harvester Co.* v. *Missouri*, 234 U. S. 199, was decided under the Missouri statute which prohibited any combination that lessened or tended to lessen competition.

The elimination of competition between the units combined by the Steel Corporation did not amount to an undue restriction of competition in the steel trade and so produce a restraint thereof.

*Mr. George Welwood Murray* for John D. Rockefeller and John D. Rockefeller, Jr., appellees.

MR. JUSTICE McKENNA delivered the opinion of the court.

Suit against the Steel Corporation and certain other companies which it directs and controls by reason of the ownership of their stock, it and they being separately and collectively charged as violators of the Sherman Anti-Trust Act.

It is prayed that it and they be dissolved because engaged in illegal restraint of trade and the exercise of monopoly.

Special charges of illegality and monopoly are made and special redresses and remedies are prayed, among others, that there be a prohibition of stock ownership and exer-

cise of rights under such ownership, and that there shall be such orders and distribution of the stock and other properties as shall be in accordance with equity and good conscience and "shall effectuate the purpose of the Anti-Trust Act." General relief is also prayed.

The Steel Corporation is a holding company only; the other companies are the operating ones, manufacturers in the iron and steel industry, twelve in number. There are, besides, other corporations and individuals more or less connected with the activities of the other defendants that are alleged to be instruments or accomplices in their activities and offendings; and that these activities and offendings (speaking in general terms) extend from 1901 to 1911, when the bill was filed, and have illustrative periods of significant and demonstrated illegality.

Issue is taken upon all these charges, and we see at a glance what detail of circumstances may be demanded, and we may find ourselves puzzled to compress them into an opinion that will not be of fatiguing prolixity.

The case was heard in the District Court by four judges. They agreed that the bill should be dismissed; they disagreed as to the reasons for it. 223 Fed. Rep. 55. One opinion (written by Judge Buffington and concurred in by Judge McPherson) expressed the view that the Steel Corporation was not formed with the intention or purpose to monopolize or restrain trade, and did not have the motive or effect "to prejudice the public interest by unduly restricting competition or unduly obstructing the course of trade." The corporation, in the view of the opinion, was an evolution, a natural consummation of the tendencies of the industry on account of changing conditions, practically a compulsion from "the metallurgical method of making steel and the physical method of handling it," this method, and the conditions consequent upon it, tending to combinations of capital and energies rather than diffusion in independent action. And the

concentration of powers (we are-still representing the opinion) was only such as was deemed necessary, and immediately manifested itself in improved methods and products and in an increase of domestic and foreign trade. Indeed an important purpose of the organization of the corporation was the building up of the export trade in steel and iron which at that time was sporadic, the mere dumping of the products upon foreign markets.

Not monopoly, therefore, was the purpose of the organization of the corporation but concentration of efforts with resultant economies and benefits.

The tendency of the industry and the purpose of the corporation in yielding to it were expressed in comprehensive condensation by the word "integration," which signifies continuity in the processes of the industry from ore mines to the finished product.

All considerations deemed pertinent were expressed and their influence was attempted to be assigned and, while conceding that the Steel Corporation, after its formation in times of financial disturbance, entered into informal agreements or understandings with its competitors to maintain prices, they terminated with their occasions, and, as they had ceased to exist, the court was not justified in dissolving the corporation.

The other opinion (by Judge Woolley and concurred in by Judge Hunt, 223 Fed. Rep. 161) was in some particulars, in antithesis to Judge Buffington's. The view was expressed that neither the Steel Corporation nor the preceding combinations, which were in a sense its antetypes, had the justification of industrial conditions, nor were they or it impelled by the necessity for integration, or compelled to unite in comprehensive enterprise because such had become a condition of success under the new order of things. On the contrary, that the organizers of the corporation and the preceding companies had illegal purpose from the very beginning, and the corporation

became "a combination of combinations, by which, directly or indirectly, approximately 180 independent concerns were brought under one business control," which, measured by the amount of production, extended to 80% or 90% of the entire output of the country, and that its purpose was to secure great profits which were thought possible in the light of the history of its constituent combinations, and to accomplish permanently what those combinations had demonstrated could be accomplished temporarily, and thereby monopolize and restrain trade.[1]

---

[1] As bearing upon the power obtained and what the Corporation did we give other citations from Judge Woolley's opinion as follows:

"The ore reserves acquired by the corporation at and subsequent to its organization, the relation which such reserves bear to ore bodies then existing and subsequently discovered, and their bearing upon the question of monopoly of raw materials, are matters which have been discussed in the preceding opinion, and with the reasoning as well as with the conclusion that the corporation has not a monopoly of the raw materials of the steel industry, I am in entire accord."

"Further inquiring whether the corporation inherently possesses monopolistic power attention is next given to its proportion of the manufacture and sale of finished iron and steel products of the industry. Upon this subject there is a great volume of testimony, a detailed consideration of which in an opinion would be quite inexcusable. As a last analysis of this testimony, it is sufficient to say it shows that, large as was the corporation, and substantial as was its proportion of the business of the industry, the corporation was not able in the first ten years of its history to maintain its position in the increase of trade. During that period, its proportion of the domestic business decreased from 50.1 per cent. to 40.9 per cent. and its increase of business during that period was but 40.6 per cent. of its original volume. Its increase of business, measured by percentage, was exceeded by eight of its competitors, whose increase of business, likewise measured by percentage, ranged from 63 to 3779. This disparity in the increase of production indicates that the power of the corporation is not commensurate with its size, and that the size and the consequent power of the corporation are not sufficient to retard prosperous growth of efficient competitors.

"From the vast amount of testimony, it is conclusively shown that the Steel Corporation did not attempt to exert a power, if such it

The organizers, however (we are still representing the opinion), underestimated the opposing conditions and at the very beginning the Corporation instead of relying upon its own power sought and obtained the assistance and the coöperation of its competitors (the independent companies). In other words the view was expressed that the testimony did "not show that the corporation in and of itself ever possessed or exerted sufficient power when acting alone to control prices of the products of the industry." Its power was efficient only when in coöperation with its competitors, and hence it concerted with them in the expedients of pools, associations, trade meetings, and finally in a system of dinners inaugurated in 1907 by the president of the company, E. H. Gary, and called "the Gary Dinners." The dinners were congregations of producers and "were nothing but trade meetings," successors of the other means of associated action and control through such action. They were instituted first in "stress of panic," but, their potency being demonstrated, they were afterwards called to control prices "in periods of industrial calm." "They were pools without penalties" and more efficient in stabilizing prices. But it was the further declaration that "when joint action was either refused or withdrawn the Corporation's prices were controlled by competition."

The Corporation, it was said, did not at any time abuse the power or ascendency it possessed. It resorted to none of the brutalities or tyrannies that the cases illustrate of

---

possessed, to oppress and destroy its competitors, and it is likewise disclosed by the history of the industry subsequent to the organization of the corporation that if it had made such an attempt it would have failed. It is also shown by the testimony that, acting independently and relying alone upon its power and wealth, great as they were, the corporation has never been able to dominate the steel industry by controlling the supply of raw materials, restraining production of finished products, or enhancing and maintaining the prices of either."

other combinations. It did not secure freight rebates; it did not increase its profits by reducing the wages of its employees—whatever it did was not at the expense of labor; it did not increase its profits by lowering the quality of its products, nor create an artificial scarcity of them; it did not oppress or coerce its competitors—its competition, though vigorous, was fair; it did not undersell its competitors in some localities by reducing its prices there below those maintained elsewhere, or require its customers to enter into contracts limiting their purchases or restricting them in resale prices; it did not obtain customers by secret rebates or departures from its published prices; there was no evidence that it attempted to crush its competitors or drive them out of the market, nor did it take customers from its competitors by unfair means, and in its competition it seemed to make no difference between large and small competitors. Indeed it is said in many ways and illustrated that "instead of relying upon its own power to fix and maintain prices, the corporation, at its very beginning sought and obtained the assistance of others." It combined its power with that of its competitors. It did not have power in and of itself, and the control it exerted was only in and by association with its competitors. Its offense, therefore, such as it was, was not different from theirs and was distinguished from theirs "only in the leadership it assumed in promulgating and perfecting the policy." This leadership it gave up, and it had ceased to offend against the law before this suit was brought. It was hence concluded that it should be distinguished from its organizers and that their intent and unsuccessful attempt should not be attributed to it, that it "in and of itself is not now and has never been a monopoly or a combination in restraint of trade," and a decree of dissolution should not be entered against it.

This summary of the opinions, given necessarily in paraphrase, does not adequately represent their ability

and strength, but it has value as indicating the contentions
of the parties, and the ultimate propositions to which the
contentions are addressed.   The opinions indicate that
the evidence admits of different deductions as to the
genesis of the Corporation and the purpose of its organiz-
ers, but only of a single deduction as to the power it
attained and could exercise.   Both opinions were clear
and confident that the power of the Corporation never did
and does not now reach to monopoly, and their review of
the evidence, and our independent examination of it,
enable us to elect between their respective estimates of it,
and we concur in the main with that of Judges Woolley,
and Hunt.   And we add no comment except, it may be,
that they underestimated the influence of the tendency
and movement to integration, the appreciation of the
necessity or value of the continuity of manufacture from
the ore to the finished product.   And there was such a
tendency; and though it cannot be asserted it had become
a necessity, it had certainly become a facility of indus-
trial progress.   There was, therefore, much to urge it and
give incentive to conduct that could accomplish it.   From
the nature and properties of the industry, the processes of
production were something more than the stage and
setting of the human activities.   They determined to an
extent those activities, furnished their motives, and gave
test of their quality—not, of course, that the activities
could get any immunity from size, or resources, or energies,
whether exerted in integrated plants or diversified ones.

The contentions of the case, therefore, must be judged
by the requirements of the law, not by accidental or
adventitious circumstances.   But what are such circum-
stances?   We have seen that it was the view of the District
Court that size was such a circumstance and had no
accusing or excusing influence.   The contention of the
Government is to the contrary.   Its assertion is that the
size of the Corporation being the result of a "combination

of powerful and able competitors" had become "substantially dominant" in the industry and illegal. And that this was determined. The companies combined, is the further assertion, had already reached a high degree of efficiency, and in their independence were factors in production and competition, but ceased to be such when brought under the regulating control of the Corporation, which by uniting them offended the law; and that the organizers of the Corporation "had in mind the specific purposes of the restraint of trade and the enormous profits resulting from that restraint." .

It is the contention of the Corporation opposing those of the Government and denying the illegal purposes charged against it, that the industry demanded qualities and an enterprise that lesser industries do not demand and must have a corresponding latitude and facility. Indeed, it is insisted that the industry had practically, (to quote the words of Judge Buffington, he quoting those of a witness,) "reached the limit, or very nearly so, at which economies from a metallurgical or mechanical standpoint could be made effective," and "that instead, as was then the practice, of having one mill to make 10 or 20 or 50 products, the greatest economy would result from having one mill make one product, and make that product continuously." In other words, that there was a necessity for integration, and rescue from the old conditions—from their improvidence and waste of effort; and that, in redress of the conditions, the Corporation was formed, its purpose and effect being "salvage not monopoly," to quote the words of counsel. It was, is the insistence, the conception of ability, "a vision of a great business which should embrace all lines of steel and all processes of manufacture from the ore to the finished product and which by reason of the economies thus to be effected and the diversity of products it would be able to offer, could successfully compete in all the markets of the world."

It is urged further that to the discernment of that great possibility was added a courage that dared attempt its accomplishment, and the conception and the courage made the formation of the Corporation notable but did not make it illegal.

We state the contentions, we do not have to discuss them, or review the arguments advanced for their acceptance or repulsion. That is done in the opinions of the district judges, and we may well despair to supplement the force of their representation of the conditions antecedent to the formation of the Corporation and in what respect and extent its formation changed them. Of course in that representation and its details there is guidance to decision, but they must be rightly estimated to judge of what they persuade. Our present purpose is not retrospect for itself, however instructive, but practical decision upon existing conditions, that we may not by their disturbance produce, or even risk, consequences of a concern that cannot now be computed. In other words, our consideration should be of not what the Corporation had power to do or did, but what it has now power to do and is doing, and what judgment shall be now pronounced—whether its dissolution, as the Government prays, or the dismissal of the suit, as the Corporation insists?

The alternatives are perplexing—involve conflicting considerations, which, regarded in isolation, have diverse tendencies. We have seen that the judges of the District Court unanimously concurred in the view that the Corporation did not achieve monopoly, and such is our deduction, and it is against monopoly that the statute is directed, not against an expectation of it, but against its realization, and it is certain that it was not realized. The opposing conditions were underestimated. The power attained was much greater than that possessed by any one competitor—it was not greater than that possessed by all of them. Monopoly, therefore, was not achieved, and

competitors had to be persuaded by pools, associations, trade meetings, and through the social form of dinners, all of them, it may be, violations of the law, but transient in their purpose and effect.   They were scattered through the years from 1901 (the year of the formation of the Corporation), until 1911, but, after instances of success and failure, were abandoned nine months before this suit was brought.   There is no evidence that the abandonment was in prophecy of or dread of suit; and the illegal practices have not been resumed, nor is there any evidence of an intention to resume them, and certainly no "dangerous probability" of their resumption, the test for which *Swift & Co.* v. *United States*, 196 U. S. 375, 396, is cited. It is our conclusion, therefore, as it was that of the judges below, that the practices were abandoned from a conviction of their futility, from the operation of forces that were not understood or were underestimated, and the case is not peculiar.   And we may say in passing that the Government cannot fear their resumption for it did not avail itself of the offer of the District Court to retain jurisdiction of the cause in order that if illegal acts should be attempted they could be restrained.

What then can now be urged against the Corporation? Can comparisons in other regards be made with its competitors and by such comparisons guilty or innocent existence be assigned it?   It is greater in size and productive power than any of its competitors, equal or nearly equal to them all, but its power over prices was not and is not commensurate with its power to produce.

It is true there is some testimony tending to show that the Corporation had such power, but there was also testimony and a course of action tending strongly to the contrary.   The conflict was by the judges of the District Court unanimously resolved against the existence of that power, and in doing so they but gave effect to the greater weight of the evidence.   It is certain that no such power

was exerted. On the contrary, the only attempt at a
fixation of prices was, as already said, through an appeal
to and confederation with competitors, and the record
shows besides that when competition occurred it was not
in pretence, and the Corporation declined in productive
powers—the competitors growing either against or in
consequence of the competition. If against the competi-
tion we have an instance of movement against what the
Government insists was an irresistible force; if in conse-
quence of competition, we have an illustration of the
adage that "competition is the life of trade" and is not
easily repressed. The power of monopoly in the Cor-
poration under either illustration is an untenable accusa-
tion.

We may pause here for a moment to notice illustrations
of the Government of the purpose of the Corporation, in-
stancing its acquisition after its formation of control over
the Shelby Steel Tube Company, the Union Steel Com-
pany, and, subsequently, the Tennessee Company. There
is dispute over the reasons for these acquisitions which we
shall not detail. There is, however, an important cir-
cumstance in connection with that of the Tennessee Com-
pany which is worthy to be noted. It was submitted to
President Roosevelt and he gave it his approval. His
approval, of course, did not make it legal, but it gives
assurance of its legality, and we know from his earnestness
in the public welfare he would have approved of nothing
that had even a tendency to its detriment. And he
testified he was not deceived and that he believed that
"the Tennessee Coal and Iron people had a property
which was almost worthless in their hands, nearly worth-
less to them, nearly worthless to the communities in which
it was situated, and entirely worthless to any financial
institution that had the securities the minute that any
panic came, and that the only way to give value to it was
to put it in the hands of people whose possession of it

would be a guarantee that there was value to it." Such
being the emergency it seems like an extreme accusation
to say that the Corporation which relieved it, and, per-
haps, rescued the company and the communities depend-
ent upon it from disaster, was urged by unworthy mo-
tives. Did illegality attach afterwards and how? And
what was the Corporation to do with the property? Let it
decay in desuetude or develop its capabilities and re-
sources? In the development, of course, there would be
profit to the Corporation, but there would be profit as well
to the world. For this reason President Roosevelt sanc-
tioned the purchase, and it would seem a distempered
view of purchase and result to regard them as violations
of law.

From this digression we return to the consideration of
the conduct of the Corporation towards its competitors.
Besides the circumstances which we have mentioned there
are others of probative strength. The company's officers
and, as well, its competitors and customers, testified that
its competition was genuine, direct and vigorous, and was
reflected in prices and production. No practical witness
was produced by the Government in opposition. Its con-
tention is based on the size and asserted dominance of the
Corporation—alleged power for evil, not the exertion of the
power in evil. Or as counsel put it, "a combination may
be illegal because of its purpose; it may be illegal because
it acquires a dominating power, not as a result of normal
growth and development, but as a result of a combination
of competitors." Such composition and its resulting
power constitute, in the view of the Government, the
offence against the law, and yet it is admitted "no com-
petitor came forward and said he had to accept the Steel
Corporation's prices." But this absence of complaint
counsel urge against the Corporation. Competitors, it is
said, followed the Corporation's prices because they made
money by the imitation. Indeed the imitation is urged as

an evidence of the Corporation's power. "Universal imitation," counsel assert, is "an evidence of power." In this concord of action, the contention is, there is the sinister dominance of the Corporation—"its extensive control of the industry is such that the others [independent companies] follow." Counsel, however, admit that there was "occasionally" some competition, but reject the suggestion that it extended practically to a war between the Corporation and the independents. Counsel say, "They [the Corporation is made a plural] called a few—they called 200 witnesses out of some forty thousand customers, and they expect with that customer evidence to overcome the whole train of price movement shown since the Corporation was formed." And "movement of prices" counsel explained "as shown by the published prices . . . they were the ones that the competitors were maintaining all during the interval."

It would seem that "200 witnesses" would be fairly representative. Besides the balance of the "forty thousand customers" was open to the Government to draw upon. Not having done so, is it not permissible to infer that none would testify to the existence of the influence that the Government asserts? At any rate, not one was called, but instead the opinion of an editor of a trade journal is adduced, and that of an author and teacher of economics whose philosophical deductions had, perhaps, fortification from experience as Deputy Commissioner of Corporations and as an employee in the Bureau of Corporations. His deduction was that when prices are constant through a definite period an artificial influence is indicated; if they vary during such a period it is a consequence of competitive conditions. It has become an aphorism that there is danger of deception in generalities, and in a case of this importance we should have something surer for judgment than speculation, something more than a deduction equivocal of itself even though the

facts it rests on or asserts were not contradicted. If the phenomena of production and prices were as easily resolved as the witness implied, much discussion and much literature have been wasted, and some of the problems that are now distracting the world would be given composing solution. Of course competition affects prices but it is only one among other influences and does not more than they, register itself in definite and legible effect.

We magnify the testimony by its consideration. Against it competitors, dealers and customers of the Corporation testify in multitude that no adventitious interference was employed to either fix or maintain prices and that they were constant or varied according to natural conditions. Can this testimony be minimized or dismissed by inferring that, as intimated, it is an evidence of power not of weakness; and power exerted not only to suppress competition but to compel testimony, is the necessary inference, shading into perjury to deny its exertion? The situation is indeed singular, and we may wonder at it, wonder that the despotism of the Corporation, so baneful to the world in the representation of the Government, did not produce protesting victims.

But there are other paradoxes. The Government does not hesitate to present contradictions, though only one can be true, such being we were told in our school books the "principle of contradiction." In one competitors (the independents) are represented as oppressed by the superior power of the Corporation; in the other they are represented as ascending to opulence by imitating that power's prices which they could not do if at disadvantage from the other conditions of competition; and yet confederated action is not asserted. If it were this suit would take on another cast. The competitors would cease to be the victims of the Corporation and would become its accomplices. And there is no other alternative. The sug-

gestion that lurks in the Government's contention that the
acceptance of the Corporation's prices is the submission of
impotence to irresistible power is, in view of the testimony
of the competitors, untenable. They, as we have seen,
deny restraint in any measure or illegal influence of any
kind. The Government, therefore, is reduced to the
assertion that the size of the Corporation, the power it
may have, not the exertion of the power, is an abhorrence
to the law, or as the Government says, "the combination
embodied in the Corporation unduly restrains competi-
tion by its *necessary effect*, [the italics are the emphasis of
the Government] and therefore is unlawful regardless of
purpose." "A wrongful purpose," the Government adds,
is "matter of aggravation." The illegality is statical,
purpose or movement of any kind only its emphasis. To
assent to that, to what extremes should we be led? Com-
petition consists of business activities and ability—they
make its life; but there may be fatalities in it. Are the
activities to be encouraged when militant, and sup-
pressed or regulated when triumphant because of the
dominance attained? To such paternalism the Govern-
ment's contention, which regards power rather than its
use the determining consideration, seems to conduct.
Certainly conducts we may say, for it is the inevitable
logic of the Government's contention that competition
must not only be free, but that it must not be pressed to
the ascendency of a competitor, for in ascendency there is
the menace of monopoly.

We have pointed out that there are several of the
Government's contentions which are difficult to represent
or measure, and, the one we are now considering, that is the
power is "unlawful regardless of purpose," is another of
them. It seems to us that it has for its ultimate principle
and justification that strength in any producer or seller is a
menace to the public interest and illegal because there is
potency in it for mischief. The regression is extreme, but

short of it the Government cannot stop.   The fallacy it conveys is manifest.

The Corporation was formed in 1901, no act of aggression upon its competitors is charged against it, it confederated with them at times in offence against the law, but abandoned that before this suit was brought, and since 1911 no act in violation of law can be established against it except its existence be such an act.   This is urged, as we have seen, and that the interest of the public is involved, and that such interest is paramount to corporation or competitors.   Granted—though it is difficult to see how there can be restraint of trade when there is no restraint of competitors in the trade nor complaints by customers—how can it be worked out of the situation and through what proposition of law?   Of course it calls for nothing other than a right application of the law and to repeat what we have said above, shall we declare the law to be that size is an offence even though it minds its own business because what it does is imitated?   The Corporation is undoubtedly of impressive size and it takes an effort of resolution not to be affected by it or to exaggerate its influence.   But we must adhere to the law and the law does not make mere size an offence or the existence of unexerted power an offence.   It, we repeat, requires overt acts and trusts to its prohibition of them and its power to repress or punish them.   It does not compel competition nor require all that is possible.

Admitting, however, that there is pertinent strength in the propositions of the Government, and in connection with them, we recall the distinction we made in the *Standard Oil Case* (221 U. S. 1, 77) between acts done in violation of the statute and a condition brought about which "in and of itself, is not only a continued attempt to monopolize, but also a monopolization."   In such case, we declared, "the duty to enforce the statute" required "the application of broader and more controlling" remedies

than in the other. And the remedies applied conformed to
the declaration; there was prohibition of future acts and
there was dissolution of "the combination found to exist
in violation of the statute" in order to "neutralize the
extension and continually operating force which the posses-
sion of the power unlawfully obtained" had "brought"
and would "continue to bring about."

Are the case and its precepts applicable here? The
Steel Corporation by its formation united under one con-
trol competing companies and thus, it is urged, a condition
was brought about in violation of the statute, and there-
fore illegal and became a "continually operating force"
with the "possession of power unlawfully obtained."

But there are countervailing considerations. We have
seen whatever there was of wrong intent could not be ex-
ecuted, whatever there was of evil effect, was discon-
tinued before this suit was brought; and this, we think,
determines the decree. We say this in full realization of
the requirements of the law. It is clear in its denunciation
of monopolies and equally clear in its direction that the
courts of the Nation shall prevent and restrain them (its
language is "to prevent and restrain violations of" the
act), but the command is necessarily submissive to the
conditions which may exist and the usual powers of a
court of equity to adapt its remedies to those conditions.
In other words, it is not expected to enforce abstractions
and do injury thereby, it may be, to the purpose of the
law. It is this flexibility of discretion—indeed essential
function—that makes its value in our jurisprudence—
value in this case as in others. We do not mean to say
that the law is not its own measure and that it can be dis-
regarded, but only that the appropriate relief in each
instance is remitted to a court of equity to determine, not,
and let us be explicit in this, to advance a policy contrary
to that of the law, but in submission to the law and its
policy, and in execution of both. And it is certainly a

matter for consideration that there was no legal attack on the Corporation until 1911, ten years after its formation and the commencement of its career. We do not, however speak of the delay simply as to its time—that there is estoppel in it because of its time—but on account of what was done during that time—the many millions of dollars spent, the development made, and the enterprises undertaken, the investments by the public that have been invited and are not to be ignored. And what of the foreign trade that has been developed and exists? The Government, with some inconsistency, it seems to us, would remove this from the decree of dissolution. Indeed, it is pointed out that under congressional legislation in the Webb Act the foreign trade of the Corporation is reserved to it. And further, it is said, that the Corporation has constructed a company called the Products Company which can be "very easily preserved as a medium through which the steel business might reach the balance of the world," and that in the decree of "dissolution that could be provided." This is supplemented by the suggestion that not only the Steel Corporation, "but other steel makers of the country, could function through an instrumentality created under the Webb Act." [C. 50, § 2, 40 Stat. 516.]

The propositions and suggestions do not commend themselves. We do not see how the Steel Corporation can be such a beneficial instrumentality in the trade of the world and its beneficence be preserved, and yet be such an evil instrumentality in the trade of the United States that it must be destroyed. And by whom and how shall all the adjustments of preservation or destruction be made?. How can the Corporation be sustained and its power of control over its subsidiary companies be retained and exercised in the foreign trade and given up in the domestic trade? The Government presents no solution of the. problem. Counsel realize the difficulty and seem to think that its solution or its evasion is in the suggestion

that the Steel Corporation and "other steel makers could function through an instrumentality created under the Webb Act." But we are confronted with the necessity of immediate judicial action under existing laws, not action under conceptions which may never be capable of legal execution. We must now decide and we see no guide to decision in the propositions of the Government.

The Government, however, tentatively presents a proposition which has some tangibility. It submits that certain of the subsidiary companies are so mechanically equipped and so officially directed as to be released and remitted to independent action and individual interests and the competition to which such interests prompt, without any disturbance to business. The companies are enumerated. They are the Carnegie Steel Company (a combination of the old Carnegie Company, the National Steel Company, and the American Steel Company), the Federal Steel Company, the Tennessee Company and the Union Steel Company (a combination of the Union Steel Company of Donora, Pa., Sharon Steel Company of Sharon, Pa., and Sharon Tin Plate Company). They are fully integrated, it is said, possess their own supplies, facilities of transportation and distribution. They are subject only to the Steel Corporation is, in effect, the declaration, in nothing but its control of their prices. We may say parenthetically that they are defendants in the suit and charged as offenders, and we have the strange circumstance of violators of the law being urged to be used as expedients of the law.

But let us see what guide to a procedure of dissolution of the Corporation and the dispersion ˄s well of its subsidiary companies, for they are asserted to be illegal combinations, is prayed. And the fact must not be overlooked or underestimated. The prayer of the Government calls for not only a disruption of present conditions but the restoration of the conditions of twenty years ago, if

not literally, substantially.  Is there guidance to this in the *Standard Oil Case* and the *Tobacco Case* [221 U. S. 1, 106]?  As an element in determining the answer we shall have to compare the cases with that at bar, but this can only be done in a general way.  And the law necessarily must be kept in mind.  No other comment of it is necessary.  It has received so much exposition that it and all it prescribes and proscribes should be considered as a consciously directing presence.

The Standard Oil Company had its origin in 1882 and through successive forms of combinations and agencies it progressed in illegal power to the day of the decree, even attempting to circumvent by one of its forms the decision of a court against it.  And its methods in using its power was of the kind that Judge Woolley described as "brutal," and of which practices, he said, the Steel Corporation was absolutely guiltless.  We have enumerated them and this reference to them is enough.  And of the practices this court said no disinterested mind could doubt that the purpose was "to drive others from the field and to exclude them from their right to trade and thus accomplish the mastery which was the end in view."  It was further said that what was done and the final culmination "in the plan of the New Jersey corporation" made "manifest the continued existence of the intent  .  .  .  and  .  .  . impelled the expansion of the New Jersey corporation." It was to this corporation, which represented the power and purpose of all that preceded, that the suit was addressed and the decree of the court was to apply.  What we have quoted contrasts that case with this.  The contrast is further emphasized by pointing out how in the case of the New Jersey corporation the original wrong was reflected in and manifested by the acts which followed the organization, as described by the court.  It said: "The exercise of the power which resulted from that organization fortifies the foregoing conclusions [as to monopoly, etc.], since the

development which came, the acquisition here and there which ensued of every efficient means by which competition could have been asserted, the slow but resistless methods which followed by which means of transportation were absorbed and brought under control, the system of marketing which was adopted by which the country was divided into districts and the trade in each district in oil was turned over to a designated corporation within the combination and all others were excluded, all lead the mind up to a conviction of a purpose and intent which we think is so certain as practically to cause the subject not to be within the domain of reasonable contention."

The *Tobacco Case* has the same bad distinctions as the *Standard Oil Case*. The illegality in which it was formed (there were two American Tobacco Companies, but we use the name as designating the new company as representing the combinations of the suit) continued, indeed progressed in intensity and defiance to the moment of decree. And it is the intimation of the opinion if not its direct assertion that the formation of the company (the word "combination" is used) was preceded by the intimidation of a trade war "inspired by one or more of the minds which brought about and became parties to that combination." In other words the purpose of the combination was signalled to competitors and the choice presented to them was submission or ruin, to become parties to the illegal enterprise or be driven "out of the business." This was the purpose and the achievement, and the processes by which achieved this court enumerated to be the formation of new companies, taking stock in others to obscure the result actually attained, but always to monopolize and retain power in the hands of the few and mastery of the trade; putting control in the hands of seemingly independent corporations as barriers to the entry of others into the trade; the expenditure of millions upon millions in buying out plants not to utilize them but to close them; by con-

stantly recurring stipulations by which numbers of persons, whether manufacturers, stockholders or employees, were required to bind themselves, generally for long periods, not to compete in the future. In the *Tobacco Case*, therefore, as in the *Standard Oil Case*, the court had to deal with a persistent and systematic lawbreaker masquerading under legal forms, and which not only had to be stripped of its disguises but arrested in its illegality. A decree of dissolution was the manifest instrumentality and inevitable. We think it would be a work of sheer supererogation to point out that a decree in that case or in the *Standard Oil Case* furnishes no example for a decree in this.

In conclusion we are unable to see that the public interest will be served by yielding to the contention of the Government respecting the dissolution of the company or the separation from it of some of its subsidiaries; and we do see in a contrary conclusion a risk of injury to the public interest, including a material disturbance of, and, it may be serious detriment to, the foreign trade. And in submission to the policy of the law and its fortifying prohibitions the public interest is of paramount regard.

We think, therefore, that the decree of the District Court should be affirmed.

*So ordered.*

Mr. Justice McReynolds and Mr. Justice Brandeis took no part in the consideration or decision of the case.

Mr. Justice Day dissenting.

This record seems to me to leave no fair room for a doubt that the defendants, the United States Steel Corporation and the several subsidiary corporations which make up that organization, were formed in violation of the Sherman Act. I am unable to accept the conclusion

which directs a dismissal of the bill instead of following the well-settled practice, sanctioned by previous decisions of this court, requiring the dissolution of combinations made in direct violation of the law.

It appears to be thoroughly established that the formation of the corporations, here under consideration, constituted combinations between competitors, in violation of law, and intended to remove competition and to directly restrain trade. I agree with the conclusions of Judges Woolley and Hunt, expressed in the court below (223 Fed. Rep. 161, *et seq.*), that the combinations were not submissions to business conditions but were designed to control them for illegal purposes, regardless of other consequences, and "were made upon a scale that was huge and in a manner that was wild," and "properties were assembled and combined with less regard to their importance as integral parts of an integrated whole than to the advantages expected from the elimination of the competition which theretofore existed between them." Those judges found that the constituent companies of the United States Steel Corporation, nine in number, were themselves combinations of steel manufacturers, and the effect of the organization of these combinations was to give a control over the industry at least equal to that theretofore possessed by the constituent companies and their subsidiaries; that the Steel Corporation was a combination of combinations by which directly or indirectly 180 independent concerns were brought under one control, and in the language of Judge Woolley (p. 167):

"Without referring to the great mass of figures which bears upon this aspect of the case, it is clear to me that combinations were created by acquiring competing producing concerns at figures not based upon their physical or their business values, as independent and separate producers, but upon their values in combination; that is, upon their values as manufacturing plants and business

concerns with competition eliminated. In many instances, capital stock was issued for amounts vastly in excess of the values of the properties purchased, thereby capitalizing the anticipated fruits of combination. The control acquired over the branches of the industry to which the combinations particularly related, measured by the amount of production, extended in some instances from 80 per cent. to 95 per cent. of the entire output of the country, resulting in the immediate increase in prices, in some cases double and in others treble what they were before, yielding large dividends upon greatly inflated capital.

"The immediate, as well as the normal effect of such combinations, was in all instances a complete elimination of competition between the concerns absorbed, and a corresponding restraint of trade."

The enormous overcapitalization of companies and the appropriation of $100,000,000 in stock to promotion expenses were represented in the stock issues of the new organizations thus formed, and were the basis upon which large dividends have been declared from the profits of the business. This record shows that the power obtained by the corporation brought under its control large competing companies which were of themselves illegal combinations, and succeeded to their power; that some of the organizers of the Steel Corporation were parties to the preceding combinations, participated in their illegality, and by uniting them under a common direction intended to augment and perpetuate their power. It is the irresistible conclusion from these premises that great profits to be derived from unified control were the object of these organizations.

The contention must be rejected that the combination was an inevitable evolution of industrial tendencies compelling union of endeavor. Nothing could add to the vivid accuracy with which Judge Woolley, speaking for himself

and Judge Hunt, has stated the illegality of the organization, and its purpose to combine in one great corporation the previous combinations by a direct violation of the purposes and terms of the Sherman Act.

For many years, as the record discloses, this unlawful organization exerted its power to control and maintain prices by pools, associations, trade meetings, and as the result of discussion and agreements at the so-called "Gary Dinners," where the assembled trade opponents secured coöperation and joint action through the machinery of special committees of competing concerns, and by prudent prevision took into account the possibility of defection, and the means of controlling and perpetuating that industrial harmony which arose from the control and maintenance of prices.

It inevitably follows that the corporation violated the law in its formation and by its immediate practices. The power, thus obtained from the combination of resources almost unlimited in the aggregation of competing organizations, had within its control the domination of the trade, and the ability to fix prices and restrain the free flow of commerce upon a scale heretofore unapproached in the history of corporate organization in this country.

These facts established, as it seems to me they are by the record, it follows that, if the Sherman Act is to be given efficacy, there must be a decree undoing so far as is possible that which has been achieved in open, notorious, and continued violation of its provisions.

I agree that the act offers no objection to the mere size of a corporation, nor to the continued exertion of its lawful power, when that size and power have been obtained by lawful means and developed by natural growth, although its resources, capital and strength may give to such corporation a dominating place in the business and industry with which it is concerned. It is entitled to maintain its size and the power that legitimately goes with it, pro-

vided no law has been transgressed in obtaining it.   But I understand the reiterated decisions of this court construing the Sherman Act to hold that this power may not legally be derived from conspiracies, combinations, or contracts in restraint of trade.   To permit this would be to practically annul the Sherman Law by judicial decree. This principle has been so often declared by the decisions that it is only necessary to refer to some of them.   It is the scope of such combinations, and their power to suppress and stifle competition and create or tend to create monopolies, which, as we have declared so often as to make its reiteration monotonous, it was the purpose of the Sherman Act to condemn, including all combinations and conspiracies to restrain the free and natural flow of trade in the channels of interstate commerce.   *Pearsall* v. *Great Northern Ry. Co.,* 161 U. S. 646, 676, 677; *Trans-Missouri Freight Assn. Case,* 166 U. S. 290, 324; *Northern Securities Case,* 193 U. S. 197; *Addyston Pipe Co.* v. *United States,* 175 U. S. 211, 238; *Harriman* v. *Northern Securities Co.,* 197 U. S. 244, 291; *Union Pacific Case,* 226 U. S. 61, 88. While it was not the purpose of the act to condemn normal and usual contracts to lawfully expand business and further legitimate trade, it did intend to effectively reach and control all conspiracies and combinations or contracts of whatever form which unduly restrain competition and unduly obstruct the natural course of trade, or which from their nature, or effect, have proved effectual to restrain interstate commerce.   *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106; *United States* v. *Reading Co.,* 226 U. S. 324; *Straus* v. *American Publishers' Assn.,* 231 U. S. 222; *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600.

This statute has been in force for nearly thirty years. It has been frequently before this court for consideration, and the nature and character of the relief to be granted

against combinations found guilty of violations of it have
been the subject of much consideration. Its interpreta-
tion has become a part of the law itself, and, if changes are
to be made now in its construction or operation, it seems
to me that the exertion of such authority rests with Con-
gress and not with the courts.

The fourth section is intended to give to courts of equity
of the United States the power to effectively control and
restrain violations of the act. In none of the cases which
have been before the courts was the character of the relief
to be granted, where organizations were found to be
within the condemnation of the act, more thoroughly con-
sidered than in the *Standard Oil* and *Tobacco Company
Cases,* reported in 221 U. S. In the former case, con-
sidering the measure of relief to be granted in the case of a
combination, certainly not more obnoxious to the Sher-
man Act than the court now finds the one under con-
sideration to be, this court declared that it must be two-
fold in character (221 U. S. 78): "1st. To forbid the doing
in the future of acts like those which we have found to
have been done in the past which would be violative
of the statute. 2d. The exertion of such measure of relief
as will effectually dissolve the combination found to exist
in violation of the statute, and thus neutralize the exten-
sion and continually operating force which the possession
of the power unlawfully obtained has brought and will
continue to bring about."

In the *American Tobacco Company Case* the nature of
the relief to be granted was again given consideration, and
it was there concluded that the only effectual remedy was
to dissolve the combination and the companies comprising
it, and for that purpose the cause was remanded to the
District Court to hear the parties and determine a method
of dissolution and of recreating from the elements com-
posing it "a new condition which shall be honestly in
harmony with and not repugnant to the law." In that

case the corporations dissolved had long been in existence, and the offending companies were organized years before the suit was brought and before the decree of dissolution was finally made. Such facts were considered no valid objection to the dissolution of these powerful organizations as the only effective means of enforcing the purposes of the Sherman Anti-Trust Act. These cases have been frequently followed in this court, and in the lower federal courts, in determining the nature of the relief to be granted, and I see no occasion to depart from them now.

As I understand the conclusions of the court, affirming the decree directing dismissal of the bill, they amount to this: that these combinations, both the holding company and the subsidiaries which comprise it, although organized in plain violation and bold defiance of the provisions of the act, nevertheless are immune from a decree effectually ending the combinations and putting it out of their power to attain the unlawful purposes sought, because of some reasons of public policy requiring such conclusion. I know of no public policy which sanctions a violation of the law, nor of any inconvenience to trade, domestic or foreign, which should have the effect of placing combinations, which have been able thus to organize one of the greatest industries of the country in defiance of law, in an impregnable position above the control of the law forbidding such combinations. Such a conclusion does violence to the policy which the law was intended to enforce, runs counter to the decisions of the court, and necessarily results in a practical nullification of the act itself.

There is no mistaking the terms of the act as they have hitherto been interpreted by this court. It was not intended to merely suppress unfair practices, but, as its history and terms amply show, it was intended to make it criminal to form combinations or engage in conspiracies or contracts in restraint of interstate trade. The remedy by injunction, at the instance of the Attorney General, was

given for the purpose of enabling the courts, as the statute states, to prohibit such conspiracies, combinations and contracts, and this court interpreting its provisions has held that the proper enforcement of the act requires decrees to end combinations by dissolving them and restoring as far as possible the competitive conditions which the combinations have destroyed. I am unable to see force in the suggestion that public policy, or the assumed disastrous effect upon foreign trade of dissolving the unlawful combination, is sufficient to entitle it to immunity from the enforcement of the statute.

Nor can I yield assent to the proposition that this combination has not acquired a dominant position in the trade which enables it to control prices and production when it sees fit to exert its power. Its total assets on December 31, 1913, were in excess of $1,800,000,000; its outstanding capital stock was $868,583,600; its surplus $151,798,428. Its cash on hand ordinarily was $75,000,000; this sum alone exceeded the total capitalization of any of its competitors, and with a single exception, the total capitalization and surplus of any one of them. That such an organization thus fortified and equipped could if it saw fit dominate the trade and control competition would seem to be a business proposition too plain to require extended argument to support it. Its resources, strength and comprehensive ownership of the means of production enable it to adopt measures to do again as it has done in the past, that is, to effectually dominate and control the steel business of the country. From the earliest decisions of this court it has been declared that it was the effective power of such organizations to control and restrain competition and the freedom of trade that Congress intended to limit and control. That the exercise of the power may be withheld, or exerted with forbearing benevolence, does not place such combinations beyond the authority of the statute which was intended to prohibit their formation,

and when formed to deprive them of the power unlawfully attained.

It is said that a complete monopolization of the steel business was never attained by the offending combinations. To insist upon such result would be beyond the requirements of the statute and in most cases practicably impossible. As we said in dealing with the Packers' combination in *Swift & Co.* v. *United States,* 196 U. S. 375, 396: "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth* v. *Peaslee,* 177 Massachusetts, 267, 272. But when that intent and the consequent dangerous probability exist, this statute [Sherman Act], like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result."

It is affirmed that to grant the Government's request for a remand to the District Court for a decree of dissolution would not result in a change in the conditions of the steel trade. Such is not the theory of the Sherman Act. That act was framed in the belief that attempted or accomplished monopolization, or combinations which suppress free competition, were hurtful to the public interest, and that a restoration of competitive conditions would benefit the public. We have here a combination in control of one-half of the steel business of the country. If the plan were followed, as in the *American Tobacco Case,* of remanding the case to the District Court, a decree might be framed restoring competitive conditions as far as practicable. See *United States* v. *American Tobacco Co.,* 191 Fed. Rep. 371. In that case the subject of reconstruction so as to restore such conditions was elaborated and care-

fully considered. In my judgment the principles there laid down if followed now would make a very material difference in the steel industry. Instead of one dominating corporation, with scattered competitors, there would be competitive conditions throughout the whole trade which would carry into effect the policy of the law.

It seems to me that if this act is to be given effect, the bill, under the findings of fact made by the court, should not be dismissed, and the cause should be remanded to the District Court, where a plan of effective and final dissolution of the corporations should be enforced by a decree framed for that purpose.

MR. JUSTICE PITNEY and MR. JUSTICE CLARKE concur in this dissent.