## CONTINENTAL CANDY CORPORATION v. CALIFORNIA & HAWAIIAN SUGAR REFINING CO. et al.

(District Court, N. D. California, S. D.  December 28, 1920.)

No. 579.

1. **Monopolies ⚌12(1)—Restraint of trade unlawful only if unreasonable.**

   A contract, to be within the prohibition of the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), must not only be in restraint of trade, but must be so unreasonably, to an unreasonable degree.

2. **Monopolies ⚌12(1)—Reasonableness of restriction must be determined by consideration of circumstances.**

   To determine whether the restraint put upon trade by a contract is reasonable or unreasonable, the motive, extent, and effect of the contract, the circumstances under which it was made, and the motives of the parties should be considered.

3. **Monopolies ⚌17(1)—Restriction against resale of sugar held not unlawful.**

   A provision in a contract for the sale of sugar forbidding its resale by the buyer, which was inserted in conformity to the suggestions of the Department of Justice and the fair price committee to avoid the purchase of sugar for hoarding at a time when there was a shortage due to the war not yet technically over, and to the efforts toward readjustment, was not an unreasonable restraint of trade, and did not invalidate the contract under the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), especially since the buyer made no objection to the validity of the contract until the sugar had been imported and was ready for delivery and the market price had greatly depreciated, so that the seller would be subjected to great loss occasioned by the buyer's want of foresight if the contract were canceled.

In Equity. Suit by the Continental Candy Corporation against the California & Hawaiian Sugar Refining Company and others. On hearing on motion for injunction after temporary restraining order was issued. Restraining order discharged, and bill of complaint dismissed.

On May 14, 1920, plaintiff Candy Company entered into a contract with defendant Sugar Company for the purchase of 750 long tons of white Java sugar. The contract contained the following provisions:

"1. The California & Hawaiian Sugar Refining Company, of San Francisco have to-day sold, and the Continental Candy Corporation of Chicago, Ill.. have to-day bought, the following sugars:

"750 tons, each, 2,240 lbs. 10% more or less, white Java sugar at $19.85, net cash, duty paid, landed weights, f. o. b. cars San Francisco, California; 25, Dutch Standard—99 Polarization.

"250 tons 10% more or less, shipment from Java September, 1920.

"500 tons, 10% more or less, shipment from Java October, 1920.

"2. Payment. Buyer agrees to immediately establish an irrevocable letter of credit through San Francisco bank sufficient to cover the amount of this purchase, same payable on presentation at said bank of invoice and shipping documents by the seller, the California & Hawaiian Sugar Refining Company. In the event of shipping documents being delayed at time of arrival of steamer, the payments are to be made against seller's delivery order.

"3. It is agreed that should strikes, wars, revolutions, accidents, dangers of the seas or other unforeseen events beyond control, prevent shipment or delay delivery of this sugar, then the California & Hawaiian Sugar Refining Company shall have the privilege of canceling this contract.

"4. Any change of import duty understood to be for account of buyer.

⚌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

"5. In the event of any dispute arising under this contract, same to be settled by San Francisco arbitration, decision of such arbitration to be final on both seller and buyer. Expense of arbitration to be paid by losing party.

"6. Buyer agrees to use these sugars only for his own manufacturing needs and under no circumstances to resell same.

"7. Sales of this sugar to manufacturers constitutes their quota of sugar from the California & Hawaiian Refining Company from delivery date of these Java whites until the end of the year."

Four days later a similar contract between the same parties for the purchase and sale of 500 additional tons of sugar was entered into.

At the time of these purchases the price of sugar in the market had been rising for some time, and was then in the neighborhood of 22 cents per pound. It continued to rise until about the middle of July, when a steady decline ensued. By the latter part of October it had reached 11 cents per pound and on the day the bill of complaint was filed herein, December 1, 1920, it had fallen to 8 cents per pound. By December 17, the day answer was filed, it had fallen to 7½ cents per pound.

Pursuant to the provisions of paragraph 2 of the contracts, irrevocable letters of credit, expiring December 31, 1920, were established by the Candy Company, $300,000 with defendant First National Bank, and $255,800 with defendant Canton Bank.

On December 1 plaintiff filed its bill of complaint alleging the making of the contracts referred to and the establishment of irrevocable letters of credit, and that plaintiff would in due course be bound to repay any sums advanced in payment of sugar delivered pursuant to the terms of the irrevocable letters of credit. Plaintiff further alleged that both of the entire agreements between plaintiff and defendant were illegal, null, and void, because the clauses forbidding the resale of the sugar and establishing plaintiff's quota were in unlawful and unreasonable restraint of trade and in violation of the anti-trust laws (Comp. St. §§ 8820–8823, 8827–8830).

It was further alleged that plaintiff, for the reasons given, had rescinded the contracts and duly notified the Sugar Company thereof. Alleging the arrival and probable immediate delivery of said sugar, with consequent demand on, and payment by, defendant banks of the sums represented by the irrevocable letters of credit, to plaintiff's irreparable damage in the premises, the prayer was for a restraining order enjoining the tender or delivery of the sugar, the negotiation or payment of either of the irrevocable letters of credit, and for a decree declaring the contracts "illegal, null and void, canceled, and rescinded," and for a permanent injunction, etc.

A temporary restraining order was issued, and by agreement the matter came on for final hearing on the merits on December 27. The substantial issues tendered by defendants were to the effect that the clauses in the contracts numbered 6 and 7, specifically objected to by plaintiff, did not suffice in any respect to operate in unreasonable or unlawful restraint of trade or to violate the anti-trust laws or to invalidate the said contracts, and that said clauses were inserted in said contracts because of the general requirement to that end made by the Attorney General of the United States acting through the Department of Justice and the Fair Trade Commission, and were imposed solely in the interest of the public and for the purpose of securing and effecting an equitable distribution of sugar and preventing speculation and profiteering therein. The contention was also made that the clauses were severable if found invalid.

Defendant Sugar Company also alleged that it had no notice of plaintiff's claim that the contracts were void, as being in restraint of trade, etc., until December 1, the day on which notice of rescission was served and the bill of complaint was filed, and that, if plaintiff had notified it of the asserted invalidity of the contracts within a reasonable time subsequent to their execution, and it had acquiesced in such invalidity, a resale of the sugar, at a small loss to defendant, might have resulted, but that plaintiff had delayed advising defendant of its attitude and claims until the price of sugar had fallen so low that a cancellation or rescission of the contracts, as prayed for by plaintiff, would result in a loss to defendant of a sum in excess of $300,000.

The principal argument in the case centered around the asserted invalidity of paragraph 6, forbidding a resale of the sugar purchased.

Charles Leroy Brown, Ira S. Lillick, and John S. Partridge, all of San Francisco, Cal., for plaintiff.

Cushing & Cushing, of San Francisco, Cal., for defendant First Nat. Bank.

H. U. Brandenstein, of San Francisco, Cal., for defendant Canton Bank.

Donald Y. Campbell and Garret W. McEnerney, both of San Francisco, Cal., for defendant California & Hawaiian Sugar Refining Co.

BLEDSOE, District Judge (after stating the facts as above). This sugar was bought in time of war—war still existing legally, if not actually. We were surrounded and hampered by all of the emergencies and efforts growing out of the war and the resultant determination on our part to see that the war program was brought to a successful conclusion, plus the further exigencies and perhaps inconsistencies arising from our intensive efforts to effect some sort of a satisfactory readjustment from our participation in the war.

This contract then is to be weighed and tested, not by what might have been the situation in the year 1913 before the war began, or not what might be the situation years hence, when the immediate economic effects of the war shall have passed into history, but what the situation was in the spring and summer of 1920—a period of uncertainty, insufficiency, readjustment, and rehabilitation.

[1] The Sherman Anti-Trust Act has recently been given very careful consideration by me in proceedings instituted by the government against the California Associated Raisin Company, and I have given it the best thought I could under the circumstances obtaining. I confess that you can read certain decisions emanating from the most exalted tribunal in the world, respecting the Sherman Anti-Trust Act, and then you can read other decisions emanating from the same tribunal, and if you are only human you may be led to assert that they do not always seem to be consistent one with another.

But, aside from all other considerations, taking the decisions in the Tobacco Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, the Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, the Trans-Missouri Case, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, the Keystone Watch Case (D. C.) 218 Fed. 502, and even the Steel Trust Case of last spring (decided March 1, 1920) 251 U. S. 417, 40 Sup. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121, as I read them and as I now recollect them (recalling particularly the emphasis with which Mr. Justice Harlan dissented in some of those cases, and the growing vehemence with which he indicated that the Supreme Court was reading into that law that which Congress had definitely and deliberately refused to incorporate into it, to wit, "the rule of reason")—taking all those cases into consideration, giving the latest expressions paramount weight, and endeavoring to arrive at the proper path to be traveled by us in the construction of the Sherman Anti-Trust Act, it seems to me that this much clearly lies

within the realm of legal indispute: Regardless of the precise and definite and seemingly controlling language of the statute, as tne same has been read here this morning, the Supreme Court of the United States, which is really the final arbiter of our destinies in this country, has said that a contract in restraint of trade, to be within the prohibitions of the Sherman Act, must not only be in restraint of trade, but it must be so unreasonably—to an unreasonable degree.

[2] The only way, or at least one of the most satisfactory ways, by which you can determine what is the reasonableness or unreasonableness of the restraint put upon trade by a contract is to consider the motive, extent and effect of the contract, consider the circumstances under which it was made, consider what the parties had in mind, what motives served to move them to the various ends they sought to attain, and then, in the light of those considerations, say whether or not that which they did was, under all the circumstances obtaining, in its nature and effect, unreasonable in its restraint upon the free flow of the commerce involved. So measured and tested, if it be unreasonable in its restraints upon trade, it lies within the prohibitions of the Sherman Law; if not, that law has no concern with it.

[3] It is common knowledge, I think, that during the war, and during the period subsequent to the actual cessation of hostilities, the question of the price and the distribution and the allocation of sugar in the United States had attained to a great deal of importance; it was a question that occasioned considerable thought. I know that the exertions and the ramifications of the Department of Justice had been multitudinous and of wide extent with respect to what should be done about the sugar question, as well as how it should be done. In my own court, during this very year, there have been at least two prosecutions under indictment for the sale of sugar, both of them anterior to the transaction involved here, and having to do with the alleged unlawfulness of the sale of sugar at prices other than those fixed by governmental authority, one case in which there was a conviction because the defendants evidently were endeavoring to profiteer upon that necessary of life. In the other case there was an acquittal because, though the sugar had been sold at an advanced price, in excess of the price fixed by the controlling agency, there was lacking that intent, sufficient to make it a criminal transaction, as the jury evidently viewed it. I call attention to these occurrences merely to indicate that there was a great deal of concern being manifested, publicly and privately, with respect to how sugar might be dealt with, to whom it might be sold, under what circumstances it might be delivered to this, that, and the other place, and the prices which might lawfully be exacted for it.

I know that down in Los Angeles—and I am assuming that the same conditions obtained here in San Francisco—for a long time sugar was sold only in small packages; you could get only one or two pounds at a time, and that only with a stated amount of other groceries. I know that I have made more than one journey to the grocery store, at the behest of my wife, to buy a lot of other things we did not need—at least at the moment—in order that we might become possessed of a sufficient amount of sugar to satisfy the requirements

of the day. So that everybody clearly understood that the existence of extraordinary conditions in the matter of the sugar supply made necessary the imposition of extraordinary restrictions; and whether it was lawful or unlawful, whether the government had the power to impose these restrictions and enforce them or not, whether we knew it all or not, or even, as intimated in the argument at the bar, whether we were proceeding along a path that was wrong economically, irrespective of what may have been the true solution of those problems and the true answers to those questions, we did appreciate that we were all joint participants in an elaborate and sustained effort to provide our people with sufficient quantities of sugar to meet their requirements, the requirements of their normal appetites, at prices fairly within reach. As a part of the program in the effort to accomplish that result, we were limiting the sale, the transportation, the allocation of sugar very materially and substantially. And most people, I think, were accepting the situation in the same spirit in which it was tendered.

It is in evidence here that at the time these contracts were made sugar was on a rising market, and on a rising market due to a then present, or confidently expected, scarcity of sugar. It is obvious that that was the case; there was not enough sugar to go around. In order that others might not be entirely deprived, some concerns, some individuals, or some territories had to be limited. I know that we had a fair price committee down in Los Angeles, and they were very busily engaged in the matter; unusual efforts were being made to see, not that a few people got all of the sugar, but that everybody got some of the sugar, if that could be made possible. Under those circumstances, the fair price committee in this community, acting under the direction of the United States Attorney and the Department of Justice, conveyed information to this vender of sugar, the defendant Sugar Company, that it might sell 10,000 tons of Java white sugar under certain limitations, the limitations contained in the contract.

It is, of course, difficult for one to read another's mind; but my own judgment is that the intent of the parties, particularly the government agencies involved, respecting the inclusion of the controverted clauses in the contracts, was, primarily, not to prevent the further disposition or the subsequent sale of this particular sugar, but to place such an inhibition upon its subsequent sale that the buyer would buy only the amount then deemed necessary for its own business requirements for the season; and this was in furtherance of what I conceive to be a very commendable plan on the part of those who gave their best thought to the matter, that sugar should not be hoarded, should not be used unwisely, and that concerns should not, in view of the growing scarcity, become possessed of amounts of sugar outside of and beyond their real requirements, which they might thereafter, it being in excess of their requirements, make a sale of to their great profit and to the very considerable detriment of the purchasing public.

If this contract had been entered into in normal times, and if the defendant Sugar Company had inserted this clause in the contract with the intention on its part to prevent a subsequent sale of this sugar

in order that it itself thereafter might sell more of its own sugar, and in that wise create some sort of a monopoly, or in that wise consummate some sort of a restraint upon the trade in sugar, I would be disposed to give very careful consideration to the argument advanced to the effect that that is the sort of a contract that public policy requires should be declared and held to be invalid. But that is not the situation at all. It is not a time of peace; it is not a time for the normal operation of usual economic laws; it is a time of war, a time of attempted readjustment and recovery from participation in the greatest war that civilization probably has known. These contracts were negotiated at a time when everybody was trying his best, was using his faculties to the very best advantage, to see if we might not be able to provide for the distribution of the necessaries of life, of which sugar is one, in such form and fashion as to prevent some considerable menace being offered to the maintenance of social integrity, social harmony, and well-being in our midst. People wanted sugar, as they wanted other things; and the aim of the government, which was concerning itself with the peace and quiet of its people, no less than with the maintenance of its own perpetuity, obviously was to interest itself as best it might in the distribution of sugar, along with other things, in order that no substantial injustices might be done, and that the greatest number of people who were craving the article might meet with satisfaction.

Under these circumstances, the government indicated to these parties that this sugar could be sold lawfully, and therefore sold at all, only if the clause providing for its use by the vendee and against its resale to any other person were inserted in the contracts. It seems to me that under such a state of facts for this court now to hold that the clauses thus inserted were unreasonable in their nature, so unreasonable as within the terms of the Sherman Anti-Trust Act to invalidate and nullify and render absolutely and completely void the entire contracts, would be to attempt the consummation of a thing under the guise of law which really would have no law or reason or justice to support it, and would tend to make of this government, not a government of law, but a government of men.

There is no evidence in the case that I can see of any attempt, any malevolent motive, on the part of this vender of sugar, to do anything other than comply with what it and nearly everybody else at the same time understood to be the lawful and the reasonable and the proper and the apt demands of governmental authority. Under those circumstances, to hold that in so doing it must now, in virtue of what has transpired, meet the loss that has been sustained here—an amount in excess of $300,000—would be to work out such an obvious injustice as to shake the very foundations of the social structure which we have erected here in our midst, and to undermine the confidence of men in government that it will see that private right is maintained and lawful engagements voluntarily entered into are made good.

Now, the truth of the whole thing is easily apparent. This case is here because sugar went down, and there was no thought of getting it here until sugar had gone down. If this contract was void—and that is the argument of counsel for the plaintiff—because of the in-

clusion of these clauses in it, then, of course, it was wholly void, void at the behest of the defendant in the case. It would have been void in the event of a continued rise in the market and a refusal on the part of defendant to deliver the sugar; would have been held void if the plaintiff had brought suit for damages for such refusal. If it was void in one case, it was void in the other. I can but faintly imagine, however, the vehemence that would have been indulged in here in this court, in support of the argument on behalf of the present plaintiff, that such a clause, entered into under such circumstances, should not suffice to enable one to escape the just consequences of his reasonable and voluntary engagement.

But the shoe is on the other foot. The price of sugar having gone down, these people now seek to escape from the consequences of an unwise move on their part, the purchase of more sugar, really, than they needed in their business. The candy business also went down, as shown by the depositions here. There was less sugar needed by it after the purchase than previously. Not only was there less sugar needed, but there was more sugar to be had, and therefore the price went tumbling down. Five or 5½ months after the contract was entered into, 5½ months after they had had time to look it over carefully, 5½ months, no doubt, after it had been well thumbed by all of their various functionaries, for the first time they came to the conclusion that it was an unlawful contract, an invalid contract, one that shocks the public conscience and is opposed to public policy, one that would result in creating an unreasonable restraint upon interstate trade; and after the sugar had been brought across the wide stretches of the sea and landed ready for delivery, and the price had gone down, and no opportunity was open to the defendant to recoup any of the tremendous loss which might have been overcome if an intimation had been conveyed to it 3 or 4 months previously, it is now proposed that this loss shall be borne, not by the buyer of the article, who bought too much, but shall be borne by the seller of the article, who was merely trying to provide that which society was demanding of it, and in a way then deemed least inimical to the welfare of society.

Aside from the fundamental disposition which I think should be in the breast of every man who expects to engage and continue in business in the United States of America—the disposition to live up to his contracts once he has entered into them—I think there ought to be the further, but equally prevalent, disposition to take one's loss, when it comes, like a sport; and whether it be a loss of $300,000, as here, or a loss of 300 cents, having overpurchased, having overbought, having failed to guess with becoming perspicacity as to the future, if one would contribute something to the well-being of our civilization, he will not seek to avoid such a contract as that, one entailing a loss in virtue of his want of foresight, because, forsooth, on the narrow ground that five months after he entered into it he got advice that it was unlawful. He should bear his loss, bear it like a man, even if the bearing of the loss mean bankruptcy. Unwelcome bankruptcy may be accepted with honor; unwarranted repudiation, however, is a continuing badge of dishonor. To do the honorable thing at all events, even

in the face of loss, is a part of the game; it is a part of the burden. And it seems to me that it is the burden that ought to be maintained by the plaintiff in this case.

Defendant contends that the clause referred to is severable, and therefore cannot in any event suffice to invalidate the entire contract, I have not had time to go into the authorities as to that, and therefore express no final opinion respecting that phase of the case. I am somewhat of the belief, with respect to a clause that in normal times would be so closely allied to the prohibitions of the Sherman Anti-Trust Act, aimed and intended to benefit the public, that the court should be loath to hold it a severable clause and one not sufficient, in itself, to invalidate the contract as a whole. But that becomes unnecessary further to consider, and need not enter into the determination of the case at this time, because of the conclusions to which I have come that, under the circumstances surrounding the transaction, the clause is in no wise an impingement upon the law as laid down by the Supreme Court in its construction of the Sherman Act.

For these reasons, I am of the belief that there is no occasion or propriety for this court at this time to seek to prevent the just consequences of this lawful engagement, lawfully entered into, from falling where they will.

The decree will be in the usual form, discharging the restraining order heretofore issued and dismissing the bill of complaint.