Mary F. SAVAGE, as Executrix of the Estate of John A. Savage, Deceased, Plaintiff,

v.

KAISER MOTORS CORPORATION, Defendant, and Kaiser-Frazer Sales Corporation, Garnishee.

Civ. No. 1405.

United States District Court
D. Minnesota, Fifth Division.

Feb. 25, 1955.

W. K. Montague and James G. Nye (of Nye, Montague, Sullivan, Atmore & McMillan), Duluth, Minn., for plaintiff.

Pierce Butler and John L. Hannaford (of Doherty, Rumble & Butler), St. Paul, Minn., for defendant.

DONOVAN, District Judge.

Plaintiff seeks to recover damages in the sum of $202,846.64. The action is based on a contract[1] making plaintiff defendant's exclusive agent and advisor in procuring iron ore from the Lake Superior iron mining district for the operation of defendant's blast furnace in Cleveland, Ohio, variously referred to as "No. 5" and "Plancor 257", and hereinafter referred to as No. 5.

Following execution of the contract, plaintiff alleges that defendant arranged with Republic Steel Corporation (hereinafter referred to as Republic) for the operation of No. 5 by Republic and that therefore the foregoing described contract was thereby amended so that all ore delivered to Republic for use in No. 5 during the years involved on the basis of the agreed commission amounted to

[1.] For a second and alternative cause of action, plaintiff had pleaded quantum meruit. However, on oral argument plaintiff's counsel did not stress this plea; therefore, nothing further will be said relative to it. See Maple Island Farm, Inc., v. Bitterling, 8 Cir., 209 F.2d 867.

said sum, after deducting $48,000 paid thereon.

By answer, defendant alleges nothing is owed plaintiff and pleads the Statute of Frauds in bar.[2]

The fundamental problem for solution will be aided by a succinct statement of the facts. The contract as pleaded[3] provided for commissions on ore purchased from the mining district by defendant. The ore ultimately delivered, however, for use in No. 5 was not directly purchased by defendant on advice of the chief executive of the United States Steel Corporation (hereinafter referred to as Steel). These events, as recited, will be clearer on the later full discussion of the facts.

The principal issue, therefore, is whether this ore delivered to Republic for use in No. 5 was purchased under the terms of the contract. If it was, plaintiff would be entitled to the commissions.

Plaintiff contends that, in light of all the evidence, this court must place a practical construction on the meaning of the contract. The defendant, on the other hand, asserts that the contract is clear in its meaning, and that the contingency which developed was fully discussed by the parties and excluded by reduction thereof to writing.

The foregoing issue, seemingly academic as stated, presents a problem difficult of solution, as recital of pertinent facts of the instant case demonstrates.

The trial opened tragically for one of the contracting parties because of the death of John A. Savage during the first noon recess of the case. Jury trial was thereupon waived, a representative of decedent's estate substituted as plaintiff, and the trial continued before the court. To avoid confusion, reference shall be made throughout to the original plaintiff, John A. Savage, rather than to the representative of his estate.

Plaintiff contends the contract was made at a time when defendant was uncertain whether it would fully operate No. 5 or make a deal with Republic for its operation. The plaintiff argues, therefore, that if ambiguity arises thereout of, the court must resort to the practical construction placed upon the contract by the parties as the best guide to its meaning and that such construction would assure plaintiff of a reasonable opportunity to operate thereunder and complete the transaction entered into, and upon which he was engaged. To this end plaintiff urges that the instant case lacks evidence of his failure to procure the required iron ore. Since there is no dispute that the ore was purchased from the Lake Superior District covered by the contract, plaintiff contends he is entitled to the commissions specified in said contract.

Defendant, in addition to the defense of the Statute of Frauds, contends inability of the plaintiff to procure the ore needed. Thus defendant asserts its deal with Steel on February 1, 1949, was to provide the iron ore plaintiff had failed to obtain. Defendant asserts that plaintiff was paid $48,000 as agreed, for all services rendered. The record is voluminous and the exhibits, consisting of letters and memoranda, are numerous. Counsel in briefs and oral arguments have exhaustively and in detail reviewed and analyzed the evidence, all of which has been helpful to the court, for the factual situation of the instant case is vitally essential to a just result.

Much of the evidence is undisputed.[4]

2. 30 Minnesota Statutes Annotated § 513.-01.

3. The contract pleaded by defendant (Exhibits 6A to 6E, both inclusive) was offered in evidence as plaintiff's exhibits.

4. As stated in footnote 3, all of the communications pleaded by defendant as the contract of the parties, were offered in evidence as plaintiff's exhibits. Plaintiff's untimely death by natural causes during the first noon recess necessitated that plaintiff's counsel resort to and adopt for trial purposes interrogatories propounded by opposing counsel and plaintiff's answers in response thereto, together with parts of plaintiff's deposition noticed and taken by defendant, conformable to pretrial practice and proper evidentiary matter.

The sequence of events should be prefaced by saying that the fall of 1948 and the three years following were of the utmost importance to plaintiff and defendant. Defendant, during and prior to World War II, had been engaged in the manufacture of steel, principally at its Fontanna, California, plant. In 1946, it went into the business of manufacturing automobiles. For this new enterprise it needed steel sheet and found that its competitors were consuming practically all that was then available on the market. Defendant begged and bartered for the steel sheet necessary to its avowed ends, and found it obtainable only at a very high price. Obviously defendant had to acquire a more advantageous trading position, or as an alternative, be compelled to abandon the business of manufacturing motor vehicles. Its competitors had grown up from infancy to Goliaths in the automotive industry, and, competing in this new field, defendant was a David sans sling and stone. Courage, ability and timing were the elements needed, and the Fontanna industrialist proved equal to the crisis.

Defendant, sagacious and determined to carry on in its new field of endeavor, resorted to research and action planned to accomplish the desired result. It was recalled that during the recent war effort, the government had built a mammoth blast furnace (No. 5) as a part of the Republic plant in Cleveland, Ohio, for the purpose of increasing steel and pig iron production during the emergency, title to which remained in the government. The furnace was so situated as to be readily integrated with Republic's adjacent plant. With the war at an end, and Korea not yet a world issue, No. 5 had little attraction to the steel industry. With that in mind, defendant planned to acquire this trading advantage by leasing No. 5 from the government. This furnace, augmented by other departments, might indeed fill the steel manufacturing void, or provide the necessary facility for trading with its neighbor, Republic. To this end defendant bent its efforts and obtained possession of No. 5, after spirited bidding with Republic. Bad feeling naturally resulted, so defendant had its blast furnace, but without the iron ore to operate it.

Edgar Kaiser, president of defendant and a member of its board of directors, with certain fellow officers, was then advised to interview the president of the Oliver Iron Mining Company (the largest producer of iron ore in the United States, hereinafter referred to as the Oliver), a subsidiary of Steel. This Edgar Kaiser did, and was promptly informed that the Oliver had more commitments for iron ore than it could meet.[5] Oliver's president then recommended that defendant contact plaintiff, which defendant did. Following this and other meetings and negotiations, the contract here in question was entered into, creating a relationship of principal and agent. From this point on, the conduct of the parties is extremely important in determining the commitments and understanding of the contracting parties.

The crux of the ore problem for plaintiff and defendant, as above stated, was that the Oliver's ore supply was being seriously depleted. It was imperative, therefore, that one bargaining with it for iron ore be in a position to offer something in return to take its place. Confronted with this dilemma, plaintiff

---

5. The time was the fall of 1948. The strain of two world wars had depleted the Oliver's ore reserves to a worrisome point. Our ramparts now extended from the Rhine in Europe to the Yalu in Korea. The march of Communism could not be contained within the "iron and bamboo curtains." This threat, and the possibilities of the atomic bomb required preparation and vigilance by the United States if Western civilization were to survive. The wheels of industry began to spin anew. Sinews of war were once more needed, which in this industry meant increased demands for steel. Thus defendant was stymied in its attempts to get a foot in the door of the steel citadel at this crucial period in history.

began negotiations with the Oliver, and in connection therewith, discussed a possible trade of compensation iron ore in a Cuyuna Range property known as the McGinty mine[6], in reciprocity, for delivery of qualified ore to No. 5 as provided by said contract.

Almost simultaneously, defendant's officers (purportedly anxious to make certain that ore would be forthcoming from the Oliver for its requirements) met with the president of Steel in New York City. Significantly, this meeting of Edgar F. Kaiser with Steel was against the advice of Savage, who had urged defendant to follow a well-established corporate policy of proceeding through the Oliver to Steel.[7] Kaiser testified that he found Steel's president (Fairless) receptive and ready to cooperate without need for the expected sales talk that Kaiser was prepared to deliver. Kaiser told Fairless that defendant was prepared, if necessary, to go into the mining and shipping business to get iron ore to No. 5, but needed the purchase of Oliver ore before such new operation could be made ready. Fairless is quoted by defendant as advising it to refrain from going into the ancillary business of mining and shipping iron ore on the assurance that the ore required for No. 5 would be delivered by Steel through Republic, and defendant would get the steel sheet necessary for its new automobile industry. Defendant contends that it was for this reason that it agreed to refrain from going into the mining and shipping business and transferred No. 5 to Republic under the arrangement that 500,000 tons of ore per year, required under the agreement, would be forthcoming from Oliver to Republic.

From the testimony and exhibits introduced, it seems readily apparent that the replacement of ore and the possibility of the McGinty property meeting this need were most important factors in the ultimate decision of Steel to furnish the ore for No. 5. Prior to the conferences between Steel and defendant there had been considerable communicating between plaintiff, defendant and the Oliver. Defendant knew that ore tonnage would have to be replaced. Kaiser's testimony in the instant case admits that he advised his benefactor (Steel) that through defendant's agent (plaintiff) defendant had an interest in the McGinty mine and that he told Fairless substantially in these words that "whatever rights we have you can have" and that in response thereto Fairless said, "Talk to our boys [Munson of Steel and Elstad of Oliver] about that."[8] How, in the face of this

6. While defendant disputes the interest plaintiff had in this McGinty mine, subsequent discussion shows it knew plaintiff had some assignable rights.

7. Plaintiff all the while had been endeavoring to get 1,500,000 tons of ore from the Oliver by conferences with the latter's president, R. T. Elstad in Duluth, Elstad indicating to plaintiff that the possible transfer of the McGinty mine to the Oliver as "compensation ore" might lead to a solution of defendant's ore problem.

8. Plaintiff's Exhibit 11 is revealing in that, despite defendant's protest of little or no knowledge of plaintiff's negotiating with Oliver and it for the delivery of the McGinty mine, it in fact knew quite in detail the plans for "compensation ore." Plaintiff's Exhibit 11 reads as follows (italics supplied):

"February 5, 1949
"Mr. Charles White, President
"Republic Steel Corporation
"Cleveland, Ohio
"Dear Mr. White:
"Reference is made to our recent negotiations concerning the operation of Plancor 257. We have been advised by Mr. Fairless, President of the United States Steel Corporation, that they will furnish 500,000 tons of ore per year, starting in 1950 and ending in 1952, or a total of 1,500,000 tons in the three year period. In view of the fact that we are entering into an operating agreement with your corporation for a period of five years, we have so advised U. S. Steel Corporation and they in turn have agreed to furnish the 1,500,000 tons of ore, in the period herein above stated, to your corporation.
"We have employed Mr. John Savage as Consulting Engineer on our ore re-

type of bargaining, can anyone deny that plaintiff was the procuring cause of obtaining the ore, argues plaintiff.

Plaintiff urges that the McGinty ore is significant in the instant case for the reason that it establishes the continuous nature of the negotiations leading to the ultimate purchase which, standing alone, refutes defendant's claim that plaintiff as its agent had failed to such an extent as to permit competition by the principal. Plaintiff emphasizes the distinction between "procuring cause" and "motivating cause" in the minds of the third party, who may be "purchaser" or "seller". What may have motivated Fairless of Steel to adopt the plan attributed to him by Edgar Kaiser is not material to plaintiff's contention that what was finally done by Steel was but a part of a continuous negotiation in which plaintiff, as agent, participated and thereby became the "procuring cause". It is the plaintiff's further contention that the commissions due plaintiff as the procuring cause of the sale of the ore extends to ore shipped after the two-year period here in question.[9] To this last argument defendant replies that the contract is limited to

Exhibits 6A and 6E inclusive, and that such language excludes all else.

■ The foregoing exposition sufficiently states the facts and the issues involved. Needless to say, the burden is upon the plaintiff to prove that he was the procuring cause. Whether he was or not is a fact question.

Resort to the record, the communications and memoranda of the contracting parties, convinces the court that there is no violation of the Statute of Frauds, for the issue in the instant case has to do not only with interpretation and construction of a contract, but also with the important matter of performance, which the court feels is the primary issue of the instant case.

Obviously, the contract is not free from ambiguity. The letter of defendant to plaintiff dated March 18, 1949, so indicates when defendant stated, "We agreed with Mr. Fairless that we would make available to the Oliver Company 1,500,000 tons of ore which you have been able to secure for us. * * * However, the manner in which we were to make the transfer of this ore to the Oliver Company is not definite." [10]

---

quirements. Mr. Savage has advised us that he holds title to certain iron ore properties having a proven tonnage of 1,500,000 tons of ore and will furnish us such ore, if we so desire. *In our negotiations with Mr. Fairless he requested that we assign, or give, any rights we have to Mr. Savage's ore to the Oliver Mining Company and we so agreed.* In the event the Oliver Mining Company does not wish us to assign our rights to this ore to them, we are agreeable to assigning any such rights as we may have to Republic Steel Corporation.

"Very truly yours,
"EFK:c" "Edgar F. Kaiser

9. By its answer defendant also contends there can be no commission on shipments delivered after the time period stated in the contract, relying on the legal doctrine known as "Expressio unius est exclusio alterius."

10. Plaintiff's Exhibit 7M reads as follows (italics supplied):

"March 18, 1949
(time stamp)
"Received
Mar 19 1949
Office of
Edgar F. Kaiser

"Mr. John A. Savage
"John A. Savage & Company
"Duluth 2, Minnesota

"Dear Mr. Savage:

"Reference is made to your letter dated March 16th concerning our present arrangements with Republic Steel Corporation on iron ore. I am enclosing a copy of our agreement dated February 14, 1949, which covers the operation of the blast furnace and the clause providing for our best efforts in the procurement of ore during the year 1953.

"We are very clear both from Mr. White of Republic and through confirmation directly from Mr. Fairless that U. S. Steel through the Oliver Company will make available to Republic 500,000 tons of iron ore in each of the years 1950, 1951, and 1952. This ore will be sold

direct by Oliver to Republic but will be for use in Stack No. 5. It was because of this commitment by Mr. Fairless to Mr. White and also to our people that we did not provide for the ore in the formal operating agreement for the years 1950, 1951, and 1952.

*"We agreed with Mr. Fairless that we would make available to the Oliver Company 1,500,000 tons of ore which you have been able to secure for us.* At one point in the conversations we understood from Mr. White that the Oliver Company wished us to undertake the mining of this ore. We subsequently understood and it was confirmed by Mr. Fairless that it would not be necessary for us to undertake the actual mining operation. *However, the manner in which we were to make the transfer of this ore to the Oliver Company is not definite.*

"I find that this is substantially what Mr. Kaiser had told you in a telephone conversation early this month. After his conversation with you, I talked to you late one evening about the necessity of our coming to Duluth. In that conversation I recall asking you what Mr. Elstad's attitude was toward the transfer of the compensation ore, including whether K–F would have to mine this ore. If I recall correctly, you stated that you thought Mr. Elstad had not thought much about it, and, in any event, it was a matter which should be postponed until some future time when we could all sit down with Mr. Elstad and talk about it. We have, therefore, followed your advice in not pressing for clarification of this point at this time. However, if you now feel we should come to Duluth and settle the matter with Mr. Elstad, we would be glad to do so.

\*      \*      \*      \*      \*

"I am somewhat disturbed by the last paragraph in your letter which infers that we may have slighted Mr. Elstad. We are most anxious that our relations with Oliver Mining Company be kept on the friendliest plane possible. This is another reason why it may be desirable to come up and see you and Mr. Elstad in the near future. In our last telephone conversation you stated that you would be coming to Pittsburgh later this month and could conveniently stop off at Willow Run. Mr. Bedford and Mr. Kaiser are now returned from the Coast and I am sure a convenient date can be set if you are coming this way.

"Very truly yours,
"Kaiser-Frazer    Corporation
"Warren M Huff
"Director of Steel Purchases
"WMH:bb
"cc:    Mr. E. F. Kaiser
"Mr. C. P. Bedford
"Mr. T. M. Price
"Mr. G. A. Crittenden"

11. Mr. Fairless' letter to Mr. Kaiser, to which was attached a chronological outline of iron ore negotiations, and Mr. Kaiser's reply thereto, are, respectively, Plaintiff's Exhibits 56, 49 and 57, as follows:

*Plaintiff's Exhibit 56:*

\*      \*      \*      \*      \*

"Pittsburgh 30, Pa.
"May 21, 1951
"Mr. Edgar F. Kaiser
"President
"Kaiser-Frazer Corporation
"Willow Run, Michigan
"Dear Edgar:

"When you were in Pittsburgh recently you asked concerning my memory of what you might have said to Mr. Savage regarding the latter's activities in supplying iron ore.

"The best I can do is to give you a copy of notes, in chronological sequence over a period of three months, which were maintained in our Raw Materials Department.

"A copy of these notes is attached and and may serve to jog your memory.

"Sincerely yours
"/s/  B. F. Fairless
"President
"Enc.
"cc:    M. W. Reed
"R. T. Elstad"

*Plaintiff's Exhibit 49:*

"C       United States Steel
O      Company
P      May 18, 1951
Y      "Chronology

To further illustrate this point, on November 16, 1950, defendant's executive writing to plaintiff said:

"I certainly did not know there was any question concerning a commission on ore being furnished Republic Steel Corporation by U. S. Steel. \*  \*  \*  *I think the prob-* *lem here is that neither of us have all the facts.* [Emphasis supplied.]"

The situation did not improve and in the spring of 1951 defendant asked the president of Steel to assist it in clarifying the matter, which he attempted to do.[11]

▮ In retrospect it is not difficult to find proof in the evidence that plaintiff was the procuring cause in the obtaining of the ore for defendant, and that defend-

"Iron Ore Negotiations
"Kaiser-Frazer Cleveland Furnace

"1–14–49  Mr. Savage advised Mr. Elstad that an agreement had been reached between Kaiser-Frazer and Republic covering operation of the Cleveland furnace for a 5-year period from August 1, 1949, in which Kaiser-Frazer is committed to furnish 500,000 tons of iron ore during each year 1949–50–51; Republic to furnish balance of the ore required.

"1–19–49  Mr. White, President, Republic Steel Corp., telephoned Mr. Elstad regarding their negotiations with Kaiser-Frazer for operating the Cleveland furnace, stating he hoped Kaiser-Frazer could obtain the 1,500,000 tons of ore to make this deal possible. He said that Kaiser-Frazer stated that Mr. Elstad was considering an exchange of ore in the Savage Mine for Oliver ore to be shipped in 1949.

"1–20–49  Mr. Edgar Kaiser and other representatives of Kaiser-Frazer called on Mr. Elstad in Duluth relative to Oliver selling Kaiser-Frazer 500,000 tons of ore per year in 1949–50–51. Mr. Elstad suggested to Mr. Kaiser that he explore with Mr. Cox whether or not Carnegie would release to them some of their ore allotment for 1949, which he said he would do.

"1–27–49  Mr. Munson in a memorandum of this date advised Mr. Fairless that Kaiser claims to have purchased from John Savage an undeveloped ore property in Minnesota containing 1,500,000 tons of iron ore, and offers to sell this tonnage in the ground to Oliver Iron Mining Co. if they will assume his commitment of 500,000 tons per year for the next 3 year

"2–1–49  Edgar Kaiser and Warren Huff met with Mr. Fairless in New York regarding their inquiry for 1,500,000 tons of ore. Mr. Fairless stated that Oliver could not furnish them any ore for 1949, but would sell Republic 500,000 tons for 1950–51–52 to fulfill Kaiser-Frazer commitment to Republic; and at the same time Kaiser-Frazer agreed to make available to Oliver 1,500,000 tons from the Savage Mine.

"2–9–49  Mr. Elstad wrote to Mr. Laskey of Republic, attaching our Mining Engineering Department's report on the Savage Mine, stating that Kaiser-Frazer is making this ore available to us in exchange for Mesabi ores, and asking if this type of ore could be used in their furnaces. Mr. Laskey replied under date of April 18th that the ores in the Savage Mine were not of interest at this time.

"3–18–49  Mr. Savage sent Mr. Elstad copy of letter from Mr. Warren Huff of Kaiser-Frazer to him under this date, stating that they had agreed with Mr. Fairless to make available to Oliver 1,500,000 tons of ore, but that it would not be necessary for Kaiser-Frazer to undertake the actual mining operation, stating further that the manner in which they were to make the transfer of this ore to Oliver was not definite."

*Plaintiff's Exhibit 57:*

"May 31, 1951  PU30.65
"Savage

"Dear Mr. Fairless:
"Mr. Howell handed me your letter of May 21, enclosing the chronological sequence with respect to the John Savage matter. These notes do help refresh my recollection, and I want to thank you for your kindness in making them available. Within the next few weeks, Warren Huff will visit John Savage, and I am certain we will come to a mutually satisfactory conclusion of this matter.
"We are sincerely appreciative of the cooperation we have received from the Corporation in connection with our recent negotiations with General Motors. I personally want to thank you for the

ant's conclusion that "Fairless made the deal" independent of plaintiff is without convincing basis in fact.

Why was the matter of defendant's iron ore handled through Republic? It was traditional with Steel to carefully avoid monopolizing the industry.[12] It therefore arranged that the ore be delivered to one of its keenest and most capable competitors, all for the benefit of defendant. Steel knew, as did defendant, that Republic was a natural solution to defendant's problem. No. 5 was in the very midst of Republic properties and plants. Republic would get the needed iron ore. Defendant would get the needed steel sheet. Oliver's contribution of the ore would be replaced by "compensation ore" through plaintiff's efforts to transfer the McGinty mine ultimately to Oliver.

Manifestly, the president of Steel, while assuring defendant of his cooperation, was nevertheless emphasizing in the interest of industrial harmony that iron ore reserves, the production of iron ore and the sale and delivery thereof, were in the hands of specialists, such as the presidents of Oliver and Steel, for the good of all concerned. This policy is not only good business management, but sound judgment, for two world wars had about exhausted Steel's Lake Superior ore reserves. It does not seem reasonable that Steel intended to favor the defendant by depriving plaintiff of commissions he might otherwise be entitled to. The exchange of correspondence between Edgar F. Kaiser and Benjamin Fairless appears to support this line of thought.

Consideration of conversations, communications and conduct engaged in by the parties subsequent to the execution of the contract convinces the court that plaintiff was the procuring cause of the purchase of the ore.[13] Under well-considered authority, it must be decided that the ore sold by the Oliver to Republic was actually purchased within the terms of the contract under principles of law here applicable.[14]

The meaning of the verb "purchase" and the past participle "purchased" (as used in Exhibit 6A) may have reference to completed or uncompleted transactions.[15] The Statute of Frauds does not apply, for the contract finally modified as shown by competent evidence, proves performance and attempts to perform by each or both parties thereto. Their conduct tends to clarify the ambiguities which obviously arose subsequent to the initial execution of the contract. There is no limitation as to time of delivery of iron ore purchased before and shipped following the two-year period. This must be so under custom and practice that applied on the iron ranges of the Lake Superior District, as reflected by the record of the instant case. There is a distinction between the purchase of ore on the one hand, and the purchase or lease of iron ore mines, with the ore in place or in stock piles. Not to require that a party pay commissions contracted for on purchased iron ore, shipped after the two-year period, would be illogical. Plaintiff makes no claim of deceit, and is not pressing an action for fraud where the parties may show they had an agreement different from their writing.[16]

confidence you and your associates have extended us.

"Sincerely,

"Edgar F. Kaiser

"Mr. B. F. Fairless, President
"United States Steel Company
"525 William Penn Place
"Pittsburgh 30, Pennsylvania
"cc: Mr. Warren Huff"

12. United States v. U. S. Steel Corporation, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343.

13. Carney v. John Hancock Oil Co., 187 Minn. 293, 245 N.W. 367; Neumeier v. Sperzel, 223 Minn. 60, 25 N.W.2d 651.

14. Scovell v. Upham, 55 Minn. 267, 56 N.W. 812; Steidl v. McClymonds, 90 Minn. 205, 95 N.W. 906.

15. 73 C.J.S., Purchase, p. 1256.

16. Richards v. Phoenix Mutual Life Ins. Co., 8 Cir., 215 F.2d 114, 116.

Appraisal of the entire factual situation of the instant case persuades the court to conclude that ambiguity exists in the contract. For that reason, the court adopts what appears to be the practical construction placed thereupon by the contracting parties, which tends to show modification thereof subsequent to execution. The record of the instant case provides a sufficient probative basis to warrant recovery by plaintiff of the commissions herein claimed.[17]

Plaintiff may submit findings, conclusions and form of judgment consistent with the foregoing.

Defendant is allowed an exception.

17. Williston on Contracts (Revised Edition) § 623.