**KAISER MOTORS CORPORATION,**
Appellant,

v.

**Mary F. SAVAGE, as Executrix of the
Estate of John A. Savage, de-
ceased, Appellee.**

No. 15339.

United States Court of Appeals
Eighth Circuit.

Feb. 7, 1956.

Rehearing Denied March 5, 1956.

See also, 116 F.Supp. 433.

Pierce Butler, St. Paul, Minn. (John
L. Hannaford; Doherty, Rumble & But-
ler, St. Paul, Minn., and Willkie, Owen,

Farr, Gallagher & Walton, New York City, were with him on the brief), for appellant.

W. K. Montague, Duluth, Minn. (James G. Nye and Nye, Montague, Sullivan, Atmore & McMillan, Duluth, Minn., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

 John A. Savage, doing business as John A. Savage & Co., commenced this action against Kaiser Motors Corporation, defendant, alleging that he and the defendant entered into an agreement whereby the plaintiff was hired as exclusive agent of the defendant in procuring iron ore from the Lake Superior iron mining district for the operation of a certain blast furnace known as No. 5 owned or leased by the defendant at Cleveland, Ohio. Plaintiff claimed that by agreement the defendant was obligated to pay to the plaintiff for each gross ton of iron ore purchased 2% of the seasonal price, etc., at the time of shipment. Plaintiff alleged that pursuant to such exclusive agency and contract there was furnished to said furnace 1,500,000 gross tons of iron ore of a value of $12,542,-332.19 and that accordingly he was entitled to a commission of $250,846.64, on which he had been paid only the sum of $48,000.00. During the first day of trial John A. Savage died. Thereafter, a stipulation was entered into whereby the executrix of John A. Savage's estate was substituted as party plaintiff and the case was tried to the court without a jury. Based upon its memorandum opinion, findings of fact and conclusions of law, the trial court entered judgment in favor of the plaintiff. Defendant appeals to this court. The trial court was sitting as the trier of the facts; therefore its conclusion must have the same force and effect as a jury verdict, and we must view the evidence in the light most favorable to sustaining the judgment obtained by the plaintiff. Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, 418, 150 A.L.R. 1056, certiorari denied 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074.

For the sake of clarity, the appellant, Kaiser Motors Corporation (formerly Kaiser-Frazer Corporation) will be referred to as the defendant and the present appellee, Mary F. Savage, executrix of the estate of John A. Savage, deceased, will be referred to as plaintiff or as John A. Savage.

The record before us is voluminous, but for the purposes of this appeal the facts may be stated as follows:

In 1948, the defendant, having entered into the automobile manufacturing business, encountered great difficulty in procuring steel. In an attempt to remedy that situation, defendant leased from the Defense Products Corporation a large blast furnace, herein known as No. 5, which was partially integrated with the Republic Steel plant at Cleveland, Ohio. Thomas M. Price, vice president of the defendant, and in charge of procurement of raw materials to be used by the company, testified:

"The reason that Kaiser-Frazer had made the deal with the Defense Plant Corporation for the leasing of that furnace was in order to get steel and pig iron which it was having trouble purchasing from the steel companies. There was a great shortage of steel at that time for anything. * * * Our hope after getting a furnace was to work out a deal with Republic by which they would continue to operate it. It would be difficult to take over that furnace immediately and continue its operation. It would be difficult to do it and not delay the production of the furnace. But it wouldn't be difficult if one had time to separate it from Republic and operate it.

\* \* \* \* \*

"Our hope then was to get in a position where Republic would operate the furnace but would furnish

us the steel or pig iron from it that we desired. And that was the aim or hope that we were trying to accomplish at that time. However, in accomplishing that, we also had alternate plans of separate operation by Kaiser-Frazer and so forth. We tried not to overlook any possibility in any manner in any way that would help us get materials to build automobiles. We were not at all sure that we could ever agree with Republic because of the feeling of Republic over our obtaining the furnace and our relations were strained at the time and very difficult and we were making any plans we could conceive of to operate that furnace and to get the steel out of it to use, our hope being all the time that in the final analysis we could make a deal with Republic to operate so as to give us some of the benefit from the furnace. And after we had the furnace, during this period, we discovered that the obtaining of an iron ore supply for it was a very difficult problem. We found that iron ore was just as scarce as steel, so far as being able to obtain a supply was concerned."

Defendant tried every avenue it could think of to procure iron ore, at first with no success. Among other things, it interviewed the president of the Oliver Iron Mining Company, a subsidiary of the United States Steel Corporation. Mr. Elstad, Oliver's president, told defendant that Oliver had more commitments for iron ore than it could meet but recommended that the defendant contact plaintiff, an independent iron ore operator in Duluth, Minnesota, who had had many years of experience in the iron ore business. As a result of negotiations between plaintiff and defendant, the contract here in question was finally entered into.

The primary document indicating the agreement between the parties is the plaintiff's letter to the defendant dated November 15, 1948, (Exhibit 6(A)).

This consists of an offer by the plaintiff to the defendant to become,

"* * * your sole agents, advisors and engineers in examination and development re iron ore and iron ore property acquisition by lease or purchase, and in the engineering planning and development and operation management of such properties obtained and acquired by you, for a period of two (2) years beginning when you sign and make effective this agreement."

For such services plaintiff was to receive

"On any iron ore and iron ore stockpiles purchased and on any iron ore properties purchased or leased, for each gross ton shipped, a payment equalling (at time of shipment) two (2) per cent of the so-called *Seasonal Price* * * *."

There was also a provision for a retainer of $10,000.00 upon execution of the agreement and $1,583.33 on the 15th of each month for 24 months beginning December 15, 1948. The agreement was accepted December 30, 1948, by the defendant. Defendant's letter of December 10, 1948, to the plaintiff, dealing with their negotiations, stated as follows:

"(6) All of the conditions contained in your letter refer to Stack No. 5, Cleveland, and any addition thereto."

In pursuance of the understanding between the parties, and with defendant's knowledge and consent, plaintiff entered into negotiations on behalf of the defendant with Oliver Iron Mining Company and otherwise made efforts to secure iron ore or iron ore properties for the defendant. Some of such efforts were taken prior to and in contemplation of the final execution of the written contract between the parties.

Plaintiff, in negotiating with the Oliver Iron Mining Company, was informed that the latter had more demands for ore than it could supply. Plaintiff then suggested to Oliver that he could make available a property on the Cuyuna

Iron Range, herein referred to as the McGinty Mine, which contained an estimated 1,500,000 tons of iron ore. This was as an inducement to Oliver to furnish the ore immediately needed by the plaintiff, in response to which Oliver's president stated that such suggested replacement of reserves would be helpful in working out the problem.

While plaintiff was carrying on these negotiations on defendant's behalf, defendant, with plaintiff's knowledge, was negotiating with the Republic Steel Corporation in an attempt to induce Republic to operate No. 5 and to furnish pig iron and steel to the defendant. In such negotiations, Republic was insisting that the defendant must furnish a substantial part of the iron ore required for the operation of the furnace. A preliminary arrangement was reached between defendant and Republic whereby Republic would carry on the operation of No. 5 for five years, provided the defendant would supply or cause to be supplied 500,000 tons of iron ore per year for three years for the operation of No. 5, in return for which defendant would receive certain tonnages of pig iron and steel. Defendant kept plaintiff advised of the course of these proceedings and of the importance of securing the required supply of iron ore.

Plaintiff continued his efforts to consummate the arrangement with Oliver regarding the use of the McGinty property by Oliver as replacement or "compensation ore" in the event Oliver should supply the needed tonnage referred to in the preliminary agreement between the defendant and Republic. While these negotiations were going on, representatives of the defendant met with the president of the United States Steel Corporation and were advised by him that Oliver would make available to Republic 500,000 tons of iron ore in each of the years 1950, 1951 and 1952, but that instead of such ore going through the defendant to Republic it would be sold direct by Oliver to Republic for use in No. 5, and that defendant would have to furnish boat transporta-

tion for the ore. At said conference in New York, defendant, at the request of the president of Steel, agreed that it would make available to Oliver the 1,500,000 tons of ore which plaintiff had been able to secure for the defendant by transferring to Oliver whatever rights it, the defendant, had in the McGinty property. As a result of the negotiations and assurance by Steel that Oliver would furnish 1,500,000 tons of ore during the three years mentioned, the defendant entered into a final agreement with Republic for the operation of No. 5, whereby Republic was to operate the furnace for the defendant and sell to the defendant certain tonnages of basic pig iron and cold rolled steel sheets. Defendant agreed to secure the necessary lake transportation to transport the 1,500,000 tons of ore to the furnace at tariff rates.

The ore in question was therefore sold directly to Republic but it was understood by all concerned that it was furnished for use in No. 5 in conjunction with defendant's preliminary arrangement with Republic.

On February 5, 1949, the defendant wrote to Republic Steel Corporation as follows:

"Reference is made to our recent negotiations concerning the operation of Plancor 257. (No. 5) We have been advised by Mr. Fairless, President of the United States Steel Corporation, that they will furnish 500,000 tons of ore per year, starting in 1950 and ending in 1952, or a total of 1,500,000 tons in the three year period. *In view of the fact that we are entering into an operating agreement with your corporation for a period of five years, we have so advised U. S. Steel Corporation and they in turn have agreed to furnish the 1,500,000 tons of ore, in the period herein above stated, to your corporation.*

"We have employed Mr. John Savage as Consulting Engineer on our ore requirements. Mr. Savage

has advised us that he holds title to certain iron ore properties having a proven tonnage of 1,500,000 tons of ore and will furnish us such ore, if we so desire. *In our negotiations with Mr. Fairless he requested that we assign, or give, any rights we have to Mr. Savage's ore to the Oliver Mining Company and we so agreed.* In the event the Oliver Mining Company does not wish us to assign our rights to this ore to them, we are agreeable to assigning any such rights as we may have to Republic Steel Corporation." (Emphasis supplied.)

On March 18, 1949, the defendant wrote the plaintiff, in which letter it stated:

"We agreed with Mr. Fairless (president of U. S. Steel Corporation) that we would make available to the Oliver Company 1,500,000 tons of ore which you have been able to secure for us."

" * * * We subsequently understood and it was confirmed by Mr. Fairless that it would not be necessary for us to undertake the actual mining operation. However, the manner in which we were to make the transfer of this ore to the Oliver Company is not definite."

Memoranda and other evidence further indicate that the parties had in mind "Kaiser-Frazer commitment to Republic" and Kaiser-Frazer making available to Oliver 1,500,000 tons from the McGinty mine as necessary contingencies to the ultimate sale which bypassed Kaiser-Frazer.

Edgar Kaiser, president of the defendant, in his report to Henry Kaiser, chairman of the board, on January 13, 1949, said, among other things:

" * * * we agreed to the following arrangement subject to the K-F board of directors approval:

"1. K-F will lease the entire facility to Republic for a period of five years beginning May 1, 1949.

"2. Republic will operate the entire facility including blast furnace under the same conditions as our present lease and will furnish all raw materials with the exception of ore. The furnace requires seven hundred fifty thousand tons of ore per year. Republic will furnish two hundred fifty thousand tons.

"3. K-F will supply Republic with five hundred thousand tons of iron ore per year for three years at the market price and will use reasonable effort to supply five hundred thousand tons per year for the remaining two years but is not obligated to furnish ore the latter two years. * * * "

On the same date, Mr. Price and Mr. Edgar Kaiser, representing the defendant, reported on their negotiations with Republic to the plaintiff himself. They advised him that Kaiser-Frazer was to furnish Republic 500,000 tons of ore for each year beginning 1949 through 1951. They asked the plaintiff if he could "guarantee that ore would be available" to them. Plaintiff replied that it would be silly for him to so guarantee and that, "All I could do on this occasion is express my opinion, which is that I believe this ore will be forthcoming" to them. Price and Kaiser then told the plaintiff that they would accept the ore situation as he outlined it to them and would go ahead with Republic on their five-year contract.

As an indication of what Mr. Fairless, president of U. S. Steel, who was the key figure in the procurement of ore for No. 5, had before him, there was introduced into evidence Plaintiff's Exhibit 8 which was prepared for him by Mr. Munson, his vice president in charge of raw materials. Among other things, that memorandum stated:

"With reference to our telephone conversation regarding ore for Kaiser-Frazer:

"1st: Kaiser and Republic Steel Corporation have made a 5-year

agreement for Republic to operate the furnace at Cleveland which Kaiser purchased from the Government, which furnace requires approximately 800,000 tons of ore annually.

"As a part of the deal, Kaiser has agreed to furnish 500,000 gross tons of ore per year, 1949 to 1951, inclusive (1,500,000 tons).

"Kaiser claims to have purchased from John Savage an undeveloped ore property on the Range in Minnesota which is estimated to contain 1,500,000 tons of iron ore. He offers to sell this tonnage in the ground to Oliver Iron Mining Company if they will assume his commitment of 500,000 tons per year for the next 3 years."

Whether this memorandum represented a true state of affairs is beside the point. It is the information which Fairless had before him and apparently upon which he acted in instructing Oliver to furnish 1,500,000 tons of ore to Republic in the defendant's behalf.

Thereafter, Edgar Kaiser, president of Kaiser-Frazer Motors Corporation, wrote to the president of Republic Steel on February 5, 1949, reporting on his negotiations with Mr. Fairless, president of U. S. Steel, and stated:

"* * * In our negotiations with Mr. Fairless he requested that we assign, or give, any rights we have to Mr. Savage's ore to the Oliver Mining Company and we so agreed. * * *" (Emphasis supplied.)

On March 18, 1949, Mr. Huff, Director of Steel Purchases for the defendant, wrote to the plaintiff, reporting also on the conference with Fairless of U. S. Steel, and said:

"We agreed with Mr. Fairless that we would make available to the Oliver Company 1,500,000 tons of ore which you have been able to secure for us."

Mr. Fairless' entry in his chronology memorandum under date of February 1st is interesting.

"Edgar Kaiser and Warren Huff met with Mr. Fairless in New York regarding *their* inquiry for 1,500,-000 tons of ore. Mr. Fairless stated that Oliver could not furnish them any ore for 1949, but would sell Republic 500,000 tons for 1950–51–52 *to fulfill Kaiser-Frazer commitment to Republic; and at the same time Kaiser-Frazer agreed to make available to Oliver 1,500,000 tons from the Savage Mine.*" (Emphasis supplied.)

Plaintiff's theory of the case adverts first to the contract writings and contends that they did not limit commissions to ore purchased directly by or shipped directly to Kaiser-Frazer. The contract, plaintiff asserts, covered the acquisition of ore by lease or purchase for Kaiser-Frazer's No. 5 furnace. There is no difference, except of mere form, under this view, whether the ore was purchased by Kaiser-Frazer and then sold to Republic or was handled direct, as did occur.

Failing in the above contention, plaintiff argues that if the contract is ambiguous it should be given the practical construction placed upon it by the parties. This practical construction would tend to show a modification of the contract after execution based on Steel's decision to permit ore acquisition by defendant from Oliver's supply of merchant ore.

It is defendant's position that the evidence discloses that the contract by its terms limits plaintiff's commissions to ore purchased directly by or shipped directly to the defendant; that in this instance the ore was sold to Republic rather than to the defendant and was sold for the years 1950, 1951 and 1952, instead of the years 1949 and 1950, as set forth by the contract writings. It is claimed that the 1,500,000 tons of ore sold to Republic by Oliver under instructions of Fairless of U. S. Steel did not come within the purview of the agreement between plaintiff and defendant, and that accordingly defendant is not responsible to the plaintiff for commission on such ore.

We are of the opinion that the record herein clearly justifies the trial court's conclusion that the 1,500,000 tons of ore was furnished by Oliver to Republic in discharge of defendant's commitment to Republic and that as part and parcel of the agreement defendant was to make available to Oliver the "compensation ore" from the plaintiff's mine or the McGinty mine.

Commenting on the factual situation, the trial court stated, 131 F.Supp. 355, 362:

"Why was the matter of defendant's iron ore handled through Republic? It was traditional with Steel to carefully avoid monopolizing the industry. United States v. U. S. Steel Corporation, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343. It therefore arranged that the ore be be delivered to one of its keenest and most capable competitors, all for the benefit of defendant. Steel knew, as did defendant, that Republic was a natural solution to defendant's problem. No. 5 was in the very midst of Republic properties and plants. Republic would get the needed iron ore. Defendant would get the needed steel sheet. Oliver's contribution of the ore would be replaced by 'compensation ore' through plaintiff's efforts to transfer the McGinty mine ultimately to Oliver.

"Manifestly, the president of Steel, while assuring defendant of his cooperation, was nevertheless emphasizing in the interest of industrial harmony that iron ore reserves, the production of iron ore and the sale and delivery thereof, were in the hands of specialists, such as the presidents of Oliver and Steel, for the good of all concerned. This policy is not only good business management, but sound judgment, for two world wars had about exhausted Steel's Lake Superior ore reserves. It does not seem reasonable that Steel intended to favor the defendant by depriving plaintiff of commissions he might otherwise be entitled to. The exchange of correspondence between Edgar F. Kaiser and Benjamin Fairless appears to support this line of thought."

An additional significant fact brought out by the evidence was that Fairless of U. S. Steel insisted that the *defendant* furnish the boat transportation of the ore sold by Oliver to Republic. Defendant made arrangements with the Browning S. S. Company by which that company would transport the ore for delivery to Republic. Defendant agreed to pay Browning a substantial premium for this transportation, estimated at $275,000.00 the first year and $175,000.00 in subsequent years. If this was not Kaiser-Frazer ore or if it was not in discharge of Kaiser-Frazer's commitment to Republic, why was Kaiser-Frazer making such premium payments? Continuously through the evidence there is reference to "compensation ore" from the McGinty mine, clearly justifying the conclusion that the ore from the McGinty mine played a large part in Fairless' ultimate conclusion to have Oliver sell ore to Republic for use in No. 5 so that the defendant could get pig iron and steel from No. 5, which it owned or leased.

Considering all the evidence, the trial court found, *inter alia*:

"12. The supplying of said ore was the result of a continuous negotiation instituted by the plaintiff, and he was the procuring cause thereof; as of February 1, 1949, plaintiff had not failed to furnish defendant 'sufficient quantities of ore at seasonal prices' so as to permit defendant to 'make purchases of ore produced in any region * * * without payment of commission,' within the meaning of the contract between plaintiff and defendant.

"13. By the conduct, writings and conversations of plaintiff and defendant, said parties construed

the contract between them as including the furnishing of this ore to Republic by Oliver in fulfillment of defendant's aforesaid commitment to Republic regarding the operation of No. 5; and by reason thereof and in consideration of plaintiff's services in procuring said ores for defendant's benefit as aforesaid, plaintiff became entitled to the commissions specified in said contract for iron ore purchased.

"14. The ore to be supplied for use in No. 5, as above set forth, was, under the arrangement between Oliver, Republic and defendant, to be furnished during each of the three years 1950, 1951 and 1952, and 500,000 tons in each of said years was to be added to the commitment for iron ore to be delivered to Republic which already existed as between Oliver and Republic, and the increased quantity thus sold by Oliver to Republic included the 500,000 tons for said furnace for each of said years, or a total of 1,500,000 tons.

"15. At the time of the commencement of this action, the contract between plaintiff and defendant had been fully performed by the plaintiff, and the ore procured by plaintiff for defendant's benefit had been shipped by Oliver and received by Republic."

This court has heretofore considered the relative merit of inferences derived by the trial judge sitting as a jury, and the language used therein we consider appropriate here. Kansas City Stockyards Co. of Maine v. Anderson, 8 Cir., 1952, 199 F.2d 91, 93:

"There is but little, if any, conflict in the primary facts. The contentions of the parties differ as to what inferences may be drawn from the evidence. The court having found the issues in favor of the plaintiff, we must take that view of the evidence most favorable to him and the court's findings can not be set aside unless clearly erroneous.

Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. If there were conflicts in the evidence they have been resolved in favor of the plaintiff, and if the findings are sustained by substantial evidence considered in a light most favorable to plaintiff, then they should be sustained and the inferences to be drawn from the facts and circumstances are in the first instance at least to be drawn by the trial court and not by this court."

Walling v. General Industries Co., 1947, 330 U.S. 545, 550, 67 S.Ct. 883, 885, 91 L.Ed. 1088:

"We believe that the evidentiary facts afford an adequate basis for the inferences drawn by the Court in making such additional findings. At the least, we think that in drawing such inferences the Court was not clearly wrong, and conclude that the findings should therefore have been left undisturbed."

See also Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, etc., 5 Cir., 1943, 137 F.2d 176, 180, affirmed 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; U. S. v. Cold Metal Process Co., 6 Cir., 1947, 164 F.2d 754, 755, certiorari denied 334 U.S. 811, 68 S.Ct. 1016, 92 L. Ed. 1742; Widney v. U. S., 10 Cir., 1949, 178 F.2d 880, 884; Central Ry. Signal Co. v. Longden, 7 Cir., 1952, 194 F.2d 310, 317.

The trial court arrived at a permissible conclusion; that is, that the contract by its terms did not limit commissions to ore purchased directly by or shipped directly to the defendant, as defendant contends. It concluded, on substantial evidence, that the ore in question was procured from Oliver in discharge of defendant's commitment to supply Republic with that amount of ore to operate No. 5, and that the plaintiff was the procuring cause and accordingly entitled to commission thereon.

Defendant also claims that plaintiff is in no event entitled to commissions on iron ore shipped in 1951 and 1952.

Its position is that there was no express provision extending the right to commissions on shipments of *purchased* iron ore beyond the two-year term of employment, 1949 and 1950, and that, absent an express provision to the contrary, the right to further commissions ends when the period of employment ends.

It is further claimed that the express mention of two instances in which commissions were to be paid on shipments made after the two-year contract term, that is, shipment from *iron ore stockpiles* and *iron ore properties* purchased or leased, excludes by implication any suggestion that commissions were to be paid on *ore purchased* before but shipped after the two-year contract period. *(Expressio unius est exclusio alterius.)*

■ As to the latter claim, the doctrine relied upon by appellant "* * * is to aid in construction where other clearer indications are wanting. Cf. Neuberger v. Commissioner, 311 U.S. 83, 61 S.Ct. 97, 85 L.Ed. 58; United States v. Barnes, 222 U.S. 513, 32 S.Ct. 117, 56 L.Ed. 291." Master Institute of United Arts v. United States, 2 Cir., 1948, 167 F.2d 955, 957.

The contract provided in part:

"For the services outlined above you agree to pay us as follows:

"1. On any iron ore and iron ore stockpiles purchased and on any iron ore properties purchased or leased, for each gross ton shipped, a payment equalling (at time of shipment) two (2) per cent of the so-called *Seasonal Price* of * * * iron ore * * *.

"It is agreed that this payment per gross ton shipped will continue after the above two (2) year period on (a) shipments from any property or stockpile leased during said two (2) years until your lease therein is canceled and on (b) shipments on any property or stockpile purchased in fee simple until exhaustion."

Obviously the initial paragraph is extensive in application. It in no way limits the time when *purchased* ore may be shipped and commission realized therefrom. The second paragraph, however, refers to the first by means of the terms, "this payment * * * will continue after the above two (2) year period on (a) * * *", and then expresses two specific instances wherein post-payments shall be made, both dealing with *properties* and *stockpiles*. Does the second paragraph *restrict* the payments to those two instances? If it does, it negates the provisions of the first paragraph under which the commissions earned by ore being *purchased* within the contract period were due and owing, subject only to definite ascertainment as to seasonal prices. On this matter, it is just as plausible to say, as plaintiff suggests, that the reason for not mentioning the purchase now-ship later contingency was that the tonnage in that instance would have been already known; whereas, in a leasehold or stockpile situation the tonnage would be subject to generous variations.

■ There is, then, practical reason for the specific provision for the payment of commissions to continue after the two-year period on *properties* or *stockpiles*. The tonnages therein could not have been ascertained until cancellation of the leases or exhaustion of the property, which might be long after the two-year period. If plaintiff were the procuring cause of the acquisition of a mine of unknown tonnage or a stockpile of unknown tonnage, he wanted to be certain he received commissions, even if the ore was not mined and shipped until after the contract period. By the second paragraph, supra, the parties so agreed. It would be most illogical to say that they did not intend commissions to be paid on a *fixed tonnage* of ore *actually purchased* during the contract term merely because a part of it was delivered afterwards. We do not believe under the circumstances that the

doctrine *expressio unius est exclusio alterius* relied upon by the appellant is applicable as there are other clearer indications of the intention of the parties. The first paragraph, supra, provides for the payment of commissions on iron ore purchased. The second paragraph merely takes care of contingencies which did not arise; that is, the lease or purchase of stockpiles or properties of unknown tonnage with ore shipped therefrom subsequent to the two-year period. The mere failure to restate the provision of the first paragraph regarding the payment of commissions on ores *purchased* does not thereby exclude such payment.

The trial court stated, 131 F.Supp. at page 362:

"The meaning of the verb 'purchase' and the past participle 'purchased' (as used in Exhibit 6A) may have reference to completed or uncompleted transactions. 73 C.J. S., Purchase, p. 1256. The Statute of Frauds does not apply, for the contract finally modified as shown by competent evidence, proves performance and attempts to perform by each or both parties thereto. Their conduct tends to clarify the ambiguities which obviously arose subsequent to the initial execution of the contract. *There is no limitation as to time of delivery of iron ore purchased before and shipped following the two-year period.* This must be so under custom and practice that applied on the iron ranges of the Lake Superior District, as reflected by the record of the instant case. There is a distinction between the purchase of ore on the one hand, and the purchase or lease of iron ore mines, with the ore in place or in stockpiles. Not to require that a party pay commissions contracted for on purchased iron ore, shipped after the two-year period, would be illogical. Plaintiff makes no claim of deceit, and is not pressing an action for fraud where the parties may show they had an agreement different from their writing." Richards v. Phoenix Mutual Life Ins. Co., 8 Cir., 215 F.2d 114, 116. (Emphasis supplied.)

The general rule which the trial court correctly applied here is that one working on a commission basis is entitled to commission on goods sold by him during the continuance of the agency,

"* * * although the goods were not delivered or paid for, or even where the goods were not received by the principal, until after the termination of the relationship. If the contract contemplates that the agent shall receive compensation for sales of which the agent was the procuring cause, the agent is entitled to a commission on sales procured by him although the sales were actually consummated by the principal after the termination of the agency." 3 C.J.S., Agency, § 187, p. 88.

See also Zinn v. Ex-Cell-O Corp., 1944, 24 Cal.2d 290, 149 P.2d 177; Buhrmester v. Independent Plumbing & Heating Supply Co., Mo.App.1941, 151 S.W. 2d 509.

In considering the entire factual situation, the trial court adopted "what appears to be the practical construction placed thereon by the contracting parties which tends to show modification thereof subsequent to execution" and concluded that plaintiff was the procuring cause of the purchase of 1,500,000 tons of iron ore and, further, that plaintiff was entitled to commissions thereon, even though some of the ore purchased was not shipped until after the contract term.

The trial court's findings and conclusions are all based upon substantial evidence and we believe are entirely proper.

We have considered the other points raised by defendant and find no substantial error.

Affirmed.